No. 2015-1837

# United States Court of Appeals for the Federal Circuit

INTERNATIONAL BUSINESS MACHINES CORPORATION,
*Appellant,*

v.

INTELLECTUAL VENTURES II LLC,
*Appellee.*

Appeal from the United States Patent and Trademark Office, Patent
Trial and Appeal Board, IPR2014-00180

## CORRECTED OPENING BRIEF OF APPELLANT

Kenneth R. Adamo
Brent P. Ray
Eugene Goryunov
Meredith Zinanni
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Tel: (312) 862-2000

John C. O'Quinn
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W
Washington, D.C. 20005
Tel: (202) 879-5000

*Counsel for Appellant*

July 31, 2015

# CERTIFICATE OF INTEREST

Counsel for Appellant certifies the following:

**1.    The full name of every party represented by me is:**

International Business Machines Corporation ("IBM").

**2.    The name of the real party in interest is:**

IBM is the real party in interest.

**3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:**

IBM is a publicly-traded company listed on the NYSE under the symbol IBM.  IBM has no parent corporation or other company that holds 10% or more of its stock.

**4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court are:**

Kenneth R. Adamo, John C. O'Quinn, Brent P. Ray, Joel R. Merkin, Eugene Goryunov, Meredith Zinanni, and Alicia L. Shah, all of Kirkland & Ellis LLP.

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................... vi

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION ................................................... 2

STATEMENT OF THE ISSUES ........................................................ 4

STATEMENT OF THE CASE ........................................................... 5

STATEMENT OF THE FACTS ......................................................... 6

I.    The '666 Patent ....................................................................... 6

II.   Institution Of *Inter Partes* Review ..................................... 6

III.  Disputed Issues In *Inter Partes* Review Proceeding ........ 7

      A.   Construction Of "Feedback" ..................................... 8

      B.   Teaching Of "Feedback" ........................................... 11

      C.   Combining Matsuzaki And Dworkin ....................... 14

IV.   Request For Rehearing ......................................................... 16

SUMMARY OF THE ARGUMENT ................................................ 18

ARGUMENT ..................................................................................... 20

I.    Legal Standards ..................................................................... 20

II.   The PTAB's Construction Of The "Wherein" Clause Was
      Legally Erroneous, Both Substantively And Procedurally. .......... 22

      A.   The PTAB's New Construction Of The "Wherein
           Clause" Is Not The Broadest Reasonable Interpretation
           And Is Not Supported By The Evidence. ............................. 22

      B.   The PTAB Improperly Construed The "Wherein"
           Clause Based Upon Arguments Raised For The First
           Time At The Oral Hearing, After All Briefing Was
           Closed ............................................................................. 26

III.  The PTAB's Conclusion That Dworkin Did Not Teach
      "Feedback" Was In Error. ............................................................ 33

IV.   The PTAB's Conclusion That IBM Did Not Present A *Prima
      Facie* Case Of Obviousness, Measured By The

i

Preponderance Of The Evidence Standard, Was Not
Supported By Substantial Evidence And Was Premised On A
Legal Error. ...................................................................... 38

    A.    The PTAB Erred When It Faulted IBM For Allegedly
           Failing to Show "How" A POSITA Would Have
           Modified Matsuzaki Based on Dworkin's Teachings........... 39

    B.    The PTAB's Finding That IBM Did Not Explain "Why"
           A POSITA Would Have Combined Matsuzaki And
           Dworkin Is Not Supported By Substantial Evidence........... 42

CONCLUSION ........................................................................ 49

# TABLE OF AUTHORITIES

## Cases

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001) ........................................................... 34

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
   418 F.3d 1225 (Fed. Cir. 2005) ........................................................... 24

*Consolidated Edison Co. v. NLRB*,
   305 U.S. 197 (1938) .............................................................................. 21

*Consumer Watchdog v. Wi. Alumni Research Found.*,
   753 F.3d 1258 (Fed. Cir. 2014) ........................................................ 2, 3

*Duramed Pharm., Inc. v. Watson Labs., Inc.*,
   413 F. App'x 289 (Fed. Cir. 2011) ...................................................... 47

*I/P Engine, Inc. v. AOL Inc.*,
   576 F. App'x 982 (Fed. Cir. 2014) ...................................................... 47

*In re Am. Academy of Science Tech Center*,
   367 F.3d 1359 (Fed. Cir. 2004) ........................................................... 25

*In re Chevalier*,
   500 F. App'x 932 (Fed. Cir. 2013) ...................................................... 39

*In re Cuozzo Speed Techs, LLC*,
   No. 2014-1194, __ F.3d __, 2015 WL 4097949 (Fed. Cir. July 8, 2015)
   .................................................................................... 23, 24, 25, 26

*In re Etter*,
   756 F.2d 852 (Fed. Cir. 1985) (*en banc*) ............................................. 39

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ......................................... 20, 21, 33, 45

*In re Huai-Hung Kao*,
   639 F.3d 1057 (Fed. Cir. 2011) ..................................................... 21, 42

*In re Keller*,
   642 F.2d 413 (CCPA 1981) ................................................................. 39

*In re Leithem*,
   661 F.3d 1316 (Fed. Cir. 2011) ........................................................... 32

*In re Mouttet,*
    686 F.3d 1322 (Fed. Cir. 2012) ............................................................ 39

*InTouch Technologies, Inc. v. VGo Communications, Inc.,*
    751 F.3d 1327 (Fed. Cir. 2014) .................................................... 45, 46, 47

*KSR Int'l Co. v. Teleflex Inc.,*
    550 U.S. 398 (2007) ................................................................... passim

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs, Inc.,*
    628 F.3d 1359 (Fed. Cir. 2010) ............................................................ 30

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004) .............................................................. 25

*Liquid Dynamics Corp. v. Vaughan Co., Inc.,*
    355 F.3d 1361 (Fed. Cir. 2004) ............................................................ 25

*Microsoft Corp. v. Proxyconn, Inc.,*
    __ F.3d __, 2015 WL 3747257 (June 16, 2015) ............................ passim

*Perfect Web Techs, Inc. v. InfoUSA, Inc.,*
    587 F.3d 1324 (Fed. Cir. 2009) ................................................ 42, 43, 47, 48

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.,*
    786 F.3d 960 (Fed. Cir. 2015) ........................................................ 21, 41

*Rambus Inc. v. Rea,*
    731 F.3d 1248 (Fed. Cir. 2013) .................................................. 21, 30, 32

*Randall Mfg. v. Rea,*
    733 F.3d 1355 (Fed. Cir. 2013) ............................................................ 45

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
    135 S. Ct. 831 (2015) ....................................................................... 20

**Statutes**

28 U.S.C. § 1295(a)(4)(A) .................................................................... 8

35 U.S.C. § 141(c) ............................................................................. 8

35 U.S.C. § 314(a) ............................................................................ 27

35 U.S.C. § 315(e) ............................................................................. 9

35 U.S.C. § 316(c) ............................................................................ 8

35 U.S.C. § 316(e) ........................................................................... 27

35 U.S.C. § 6(b)(4) ............................................................................ 8

5 U.S.C. § 706(2) ......................................................................... 35, 47

**Other Authorities**

Patent Trial Practice Guide, 77 Fed. Reg. 48756 (Aug. 14, 2012) ......... 35

**Rules**

37 C.F.R. § 42.100(b) ................................................................. passim

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellant International Business Machines Corporation ("IBM") states that no other appeal in or from the same proceeding at the U.S. Patent and Trademark Office's ("PTO") Patent Trial and Appeal Board ("PTAB") was previously before this Court or another appellate court.

Counsel for IBM further states that district court cases in which Appellee Intellectual Ventures II LLC ("IV") has alleged that parties are infringing U.S. Patent No. 7,634,666 ("the '666 patent") may be directly affected by this Court's decision in the pending appeal. Counsel for IBM is aware that IV is asserting the '666 patent in at least the following litigations: *Intellectual Ventures II LLC v. JP Morgan Chase & Co. et al.,* No. 13-cv-3777 (S.D.N.Y.); *Intellectual Ventures II LLC v. U.S. Bancorp et al.,* No. 13-cv-02071 (D. Minn.); *Intellectual Ventures II LLC v. Suntrust Banks, Inc. et al.,* No. 13-cv-02454 (N.D. Ga.); *Intellectual Ventures II LLC v. BBVA Compass Bancshares, Inc. et al.,* No. 13-cv-01106 (N.D. Ala.); *Intellectual Ventures II LLC v. First Nat'l Bank of Omaha,* No. 13-cv-00167 (D. Neb.); *Intellectual Ventures II LLC v. Huntington Bancshares Inc. et al.,* No. 13-cv-00785 (S.D. Ohio);

*Intellectual Ventures II LLC et al. v. Citigroup, Inc. et al.*, No. 14-cv-04638 (S.D.N.Y.); and *Intellectual Ventures II LLC et al. v. PNC Financial Services Group, Inc. et al.*, No. 14-cv-00832 (W.D. Pa.).

# INTRODUCTION

The PTAB made a number of errors in finding that IBM had not demonstrated by a preponderance of the evidence that the '666 patent was unpatentable as obvious. It construed the "wherein" clause in which "feedback" appears, a claim element that neither party requested be construed. That legally erroneous construction of the "wherein" clause was based entirely upon arguments made by IV at the oral hearing that had never previously been raised in either parties' briefing—arguments made in violation of the PTAB's own rules and binding decisions to which IBM never had the opportunity to respond, and which are not supported by the intrinsic record. The PTAB compounded that legal error by applying that erroneous claim construction and misapplying the test for obviousness, imposing an improperly high and overly rigid standard on IBM—exactly what the Supreme Court rejected in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).

## STATEMENT OF JURISDICTION

IBM filed a Petition for *inter partes* review ("IPR") with the PTAB challenging the patentability of claims 1-11 of the '666 patent. The PTAB had original subject matter jurisdiction over this IPR pursuant to 35 U.S.C. §§ 6(b)(4) and 316(c). The PTAB entered a Final Written Decision on April 4, 2015, and a Decision on Request for Rehearing on May 28, 2015, both rejecting IBM's challenge to the '666 patent claims. IBM timely filed a Notice of Appeal on June 1, 2015, identifying as the subject of its appeal the Final Written Decision, Decision on Request for Rehearing, and "all underlying and related findings, orders, decisions, rulings, and opinions." IV did not file a notice of cross appeal.

This Court has jurisdiction over this appeal of a final decision of the PTAB pursuant to 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A).

IBM has suffered an injury-in-fact sufficient to confer standing to maintain this appeal. *Cf. Consumer Watchdog v. Wi. Alumni Research Found.*, 753 F.3d 1258, 1260-61 (Fed. Cir. 2014). IBM makes and sells hardware products that have certain cryptographic capabilities. IV has accused some of those products of infringing the '666 patent when used by IBM customers such as J.P. Morgan Chase & Co. IV could also

2

accuse IBM of infringing the '666 patent through its manufacture and sale of those products, or accuse other IBM customers of infringing the '666 patent by their use of those products.  IBM is precluded from filing another IPR petition, and may be estopped in any current or future proceeding from challenging the validity of the '666 patent, on any grounds IBM "raised or reasonably could have raised" in this IPR proceeding.  35 U.S.C. § 315(e).

IBM has a "particularized, concrete interest in the patentability of" the '666 patent that confers standing.  *Cf. Consumer Watchdog*, 753 F.3d at 1262-63.

# STATEMENT OF THE ISSUES

1.    Did the PTAB err as a matter of law when it construed the "wherein" clause in which "feedback" appears for the first time in its Final Written Decision, where there was no dispute regarding the proper construction of "feedback," neither party had requested construction of the "wherein" clause, the construction is not the broadest reasonable construction, the construction is not supported by the evidence, and the construction was based upon IV's untimely substantive arguments made for the first time at the oral hearing in violation of the PTAB's rules and binding decisions?

2.    Did the PTAB err when it found that IBM failed to show that Dworkin taught "feedback," where the PTAB's decision was based upon the PTAB's improper construction of the "wherein" clause in which "feedback" appears and IBM demonstrated by a preponderance of the evidence that Dworkin taught "feedback" as originally construed?

3.    Did the PTAB err when it found that IBM did not present sufficient reasons why a person having ordinary skill in the art would have combined Matsuzaki and Dworkin, under the flexible analysis

adopted in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), by a preponderance of the evidence?

## STATEMENT OF THE CASE

IBM filed a Petition requesting *inter partes* review of all claims of the '666 patent on November 20, 2013. A226. The PTAB granted IBM's request and instituted an IPR on all eleven claims on April 16, 2014. A249, A275. IV filed its Response to the Petition on July 16, 2014. A277, A335. IBM filed its Reply in support of its Petition on October 16, 2014. A337, A353. The PTAB held an oral hearing on January 13, 2015. A359. The PTAB issued its Final Written Decision on April 3, 2015, holding that claims 1-11 of the '666 patent "have not been shown by a preponderance of the evidence to be unpatentable." A1, A30.

IBM filed a Request for Rehearing on April 22, 2015. A427, A444. The PTAB denied that request on May 28, 2015. A32, A42. IBM timely filed its Notice of Appeal on June 1, 2015. A1308-1311.

## STATEMENT OF THE FACTS

### I.    The '666 Patent

U.S. Patent No. 7,634,666 to Cheng et al. ("the '666 patent") is titled "Crypto-Engine for Cryptographic Processing of Data." A44. It was filed on August 15, 2003, and issued on December 15, 2009. *Id.* It has eleven claims, two of which (1 and 4) are independent. A58. The independent claims both claim an "arithmetic unit" that includes "a multiplication unit, an addition unit and a sign inversion unit," the outputs of which are "feedback" to an arithmetic controller. *Id*.

### II.    Institution Of *Inter Partes* Review

IBM filed a Petition for *inter partes* review ("IPR") of the '666 patent on November 20, 2013, alleging that all eleven claims of the '666 patent are invalid. A226. IBM identified two base grounds on which independent claims 1 and 4 should be found unpatentable, and identified additional grounds (expanding on those base grounds) on which the dependent claims should be found unpatentable. A171. In the Petition, IBM proposed constructions for "multiplication unit," "addition unit," "sign inversion unit," "output," and "feedback." A172-175.

IV filed its Patent Owner's Preliminary Response ("POPR") on March 6, 2014.  A230, A247.  IV disputed whether IBM's proposed claim constructions were the broadest reasonable constructions, but did not offer contrary constructions for those claim elements or for any other claim elements.  A234-237.  IV did not make any arguments in its POPR that any element of the '666 patent was not taught by the prior art references.  A231.

The PTAB granted IBM's Petition and instituted IPR on April 16, 2014.  A249, A275.  In its Institution Decision, the PTAB declined to construe any claim elements.  A257-260.  The PTAB instituted IPR of all claims (1-11) on the grounds of obviousness over the combination of Matsuzaki and Dworkin (claims 1, 4, 8, 10-11), and further over Tenca (claims 2-3, 5-6) or the knowledge of one of ordinary skill in the art (claims 7, 9).  A274.  The PTAB declined to institute review on the other grounds asserted in IBM's Petition as redundant to the grounds on which IPR was instituted.  A273.

## III.   Disputed Issues In *Inter Partes* Review Proceeding

The PTAB made three findings in its Final Written Decision that are at issue in this appeal.

## A.     Construction Of "Feedback"

The claim element "feedback" appears in both independent claims of the '666 patent, in the clause "wherein the outputs of the multiplication unit, the addition unit and the sign inversion unit are ***feedback*** to the arithmetic controller" ("the 'wherein' clause").[1]   A58. In its Petition, IBM proposed that "feedback" in the '666 patent be construed to mean "a result that is directly transmitted back."  A174-175.  IV challenged whether "feedback" must be ***directly*** transmitted back in its POPR, but never offered an alternative construction for "feedback"—either as a standalone term or as part of the "wherein" clause—in its POPR. A236-237.

The PTAB declined to limit "feedback" to direct feedback in its Institution Decision.  A259.  The PTAB did not construe any other claim elements.  A260.

IV reiterated its argument that "feedback" should not be limited to direct feedback in its Patent Owner Response ("POR"), stating that the "ordinary and customary meaning of 'feedback'" is not limited to direct feedback, and the claims and specification of the '666 patent never use

---

[1]   All emphasis herein added unless otherwise noted.

the words "direct" or "directly." A291. IV further argued that "nothing in the specification disavows a broader scope or otherwise limits the scope" of "feedback." *Id.* IV's expert "agree[d] with the Board" that "feedback" should not be limited to direct feedback, and for purposes of his declaration construed feedback as "transmitted back." A946. IV again did not offer a construction for the "wherein" clause. A291-292.

IBM did not challenge the PTAB's construction, as adopted by IV and its expert, in its Reply. A338, A351-353. No issue regarding the proper construction of "feedback"—either as a standalone term or as part of the "wherein" clause—was open or otherwise outstanding at the close of the evidence. *See* A9 ("Petitioner does not challenge our initial construction of 'feedback' in its Reply.").

For the first time at the oral hearing, however, IV qualified its position that "feedback" does not need to be direct (i.e., that the outputs of the multiplication, addition, and sign inversion units need not be transmitted directly to the arithmetic controller). A407. IV made the new argument that even where "feedback" is *in*direct, the values of the outputs cannot change between leaving the multiplication, addition, or sign inversion unit and entering the arithmetic controller. *Id.* IBM

objected to this new argument, presented by IV for the first time at the oral hearing.  A423-424.

In its Final Written Decision, the PTAB construed the "wherein" clause in its entirety "to mean that the output values of the multiplication unit, the addition unit, and the sign inversion unit are feedback to the arithmetic controller, although those values may pass, unchanged, through intermediate components (e.g., latches and multiplexers)."  A9.  It did so despite the fact that: (1) neither party ever proposed a construction for the complete "wherein" clause, and (2) there was no dispute about the construction of "feedback" to be decided by the PTAB following its Institution Decision, as the parties had both agreed with the PTAB's construction of "feedback" in their POR and Reply. The PTAB did not cite any intrinsic evidence in support of its construction, only IV's argument at the oral hearing and the expert declaration of IBM's expert, Dr. Cetin Koç.  A9.  Although the PTAB's construction of the "wherein" clause was under a heading of "feedback," the PTAB said nothing about the construction of "feedback" itself as a standalone term.  *See* A8-9**.**

## B.    Teaching Of "Feedback"

In its Petition, IBM explained how Matsuzaki in combination with Dworkin teaches the "wherein" clause.    Matsuzaki discloses an arithmetic unit that includes separate multiplication, addition, and sign inversion units that have outputs.    A193-194; A78; A498-500.    IBM identified Dworkin as teaching "outputs that are feedback."    A196-197. "Dworkin teaches multiple computational arithmetic units, sub-ALU's 18," where the outputs of the sub-ALUs are sent back to the controller 20.    A188; *see also* A183, A196-197; A93, A105; A504-505.

IV did not rebut IBM's evidence regarding "feedback" in its POPR. A231.    The PTAB reviewed the evidence presented and was "persuaded that Petitioner has shown a reasonable likelihood of prevailing" that claims 1 and 4 were obvious over Matsuzaki and Dworkin.    A264, A267. With regard to "feedback," the PTAB accepted IBM's argument that "each of Dworkin's sub-ALUs is a separate computational unit and that the output of each sub-ALU is fed back directly to controller 20 via outputs 30."    A264.

In its POR, IV argued that IBM "mischaracterized" Dworkin, stating that: "(1) Dworkin does not anywhere disclose a sign inversion

11

unit, (2) Dworkin does not disclose any feedback to controller 20 of any output of a sub-ALU 18 when the sub-ALUs 18 are operating as an addition unit, and (3) Dworkin, at best, discloses feedback to controller 20 of the output of a single sub-ALU 18 when the sub-ALUs 18 are operating as a multiplication unit." A295. IV offered a lengthy technical explanation of what Dworkin purportedly teaches in support of its second and third arguments, relying upon testimony from its expert. A297-304; A954-965.

IBM addressed each of IV's arguments in its Reply. First, IBM explained that it did not contend that Dworkin disclosed a sign inversion unit. Instead, this element was found in Matsuzaki. A345. Next, IBM explained that the sub-ALUs 18 in Dworkin are discrete computation units, each of which sends its output to the controller. A345; A188; A505. IV's characterizations of the sub-ALUs 18 as "operating as a multiplication unit" or "operating as an addition unit" were thus misleading and contrary to the evidence IBM presented. A345.

IBM provided a detailed technical explanation of how the output from each sub-ALU 18 is fed back to controller 20 in rebuttal to IV's

12

description of the evidence, supported by a declaration from Dr. Koç. A345-347; A724-732; *see also* A93, A105-106. IBM further explained how the "shift left" operation in Dworkin was identical to the feedback operation in the '666 patent. A347-348. IBM reiterated these arguments at the oral hearing, explaining how each sub-ALU 18 is a computational unit whose output is transferred to the controller in a "shift left" operation. A375-378.

In its Final Written Decision, the PTAB ignored the evidence presented in IBM's Petition and Reply and Dr. Koç's expert declarations that the sub-ALUs 18 in Dworkin were computational units, finding incorrectly that this was a "late presented contention of obviousness." A17; *cf.* A264 (PTAB stating "Petitioner argues that each of Dworkin's sub-ALUs is a separate computational unit" in its Institution Decision); A183 (IBM stating "Dworkin teaches multiple computational arithmetic units" in its Petition). The PTAB found that "the output of each sub-ALU 18 other than the left-most sub-ALU 18 is fed as an input to the next sub-ALU to the left rather than fed back to the controller" in Dworkin. A20. The PTAB thus concluded that Dworkin does not teach "feeding back the output of multiple separate computational units to a

controller" and that the combination of Matsuzaki and Dworkin does not teach the "wherein" clause. A21. The PTAB did not explain how its new construction of the "wherein" clause affected its analysis. *See generally* A15-21.

### C.    Combining Matsuzaki And Dworkin

IBM explained in its Petition that "[t]he alleged invention of claims 1 and 4 would have been obvious to one having ordinary skill in the art in view of the combined teachings of Matsuzaki and Dworkin. For example, both Matsuzaki and Dworkin describe, in detail, complementary cryptographic co-processor designs and hardware implementation of Montgomery reduction, such that one having ordinary skill in the art would be motivated to combine their teachings." A183.    "Both Matsuzaki and Dworkin address hardware implementations of fast cryptographic co-processors.    Matsuzaki and Dworkin also teach Montgomery reduction, similar methods of processing cryptographic data, and internal control methodology." A197 (citations omitted); *see also* A210.  IBM's explanations were supported by Dr. Koç, who testified about why a person of ordinary skill in the art ("POSITA") would combine Matsuzaki and Dworkin. A517-519.  The

PTAB originally accepted IBM's argument and evidence that a POSITA would have considered the teachings of Matsuzaki and Dworkin together, and instituted IPR. A264, A267.

IV argued in response that IBM had not sufficiently explained *why* a POSITA would combine Matsuzaki and Dworkin. A313, A315. IV listed what it termed as seven "rationales enumerated by the Supreme Court in *KSR*" and argued that IBM did "not identify on which, if any, of the above-listed rationales it is relying for establishing obviousness" in view of the combination of Matsuzaki and Dworkin. A313-315. IV further argued that the technical disclosures of Matsuzaki and Dworkin are incompatible. A324.

IBM rebutted IV's contentions in its Reply, pointing out first that the IPR decisions IV relied upon in support of its argument were not comparable with the facts in this IPR. A340-341. IV had also misleadingly quoted Dr. Koç's declaration, whereas the full quotes do explain the rationale for combining Matsuzaki and Dworkin. A341. Finally, IBM explained the inaccuracies in IV's description of the technology disclosed in Matsuzaki and Dworkin. A341-344.

In its Final Written Decision, the PTAB found that even if the disclosures of Matsuzaki and Dworkin were compatible, IBM had not provided a sufficient explanation as to the reason a POSITA would combine the two references.  A21-30.  The PTAB did not dispute that IBM had demonstrated that the disclosures of Matsuzaki and Dworkin were similar.  A23-26.  However, the PTAB found that the similarities between Matsuzaki and Dworkin, and the other arguments and evidence presented by IBM and Dr. Koç regarding combining these references, was not "sufficiently a reason, with rational underpinning, to combine Matsuzaki and Dworkin."  A29.

## IV.   Request For Rehearing

IBM filed a Request for Rehearing, identifying three errors with the PTAB's Final Written Decision: (1) the PTAB's construction of the "wherein" clause after-the-fact was both improper and unsupported by the evidence; (2) the PTAB's finding that Dworkin did not teach "feedback" was based upon the PTAB's incorrect construction of the "wherein" clause; and (3) the PTAB had erroneously applied "an improperly high and rigid standard of obviousness" for demonstrating a

motivation to combine Matsuzaki and Dworkin.  A428.  The PTAB rejected IBM's arguments and declined to change its decision.  A42.

## SUMMARY OF THE ARGUMENT

The PTAB erred as a matter of law in its construction of the "wherein" clause. That construction is not the broadest reasonable construction and is not supported by the evidence. The PTAB also violated its own rules and binding decisions when it solicited and allowed argument at the oral hearing regarding the meaning of the "wherein" clause that had never before been presented or raised, and then adopted that improper argument to construe, for the first time, the "wherein" clause in its Final Written Decision. Neither party had identified the "wherein" clause as needing construction, and thus neither party had briefed it.

The PTAB's determination that IBM did not demonstrate that Dworkin taught "feedback" was premised on the PTAB's improper and incorrect construction of the "wherein" clause. The PTAB's finding is incorrect and not supported by substantial evidence, gauged by the preponderance of the evidence standard governing IPR. IBM presented sufficient evidence to demonstrate, under that standard, that Dworkin teaches "feedback," as properly construed.

Finally, the PTAB held IBM to an improperly high and rigid standard to demonstrate that a POSITA would be motivated to combine the prior art references Matsuzaki and Dworkin.   Under the flexible obviousness analysis adopted by the U.S. Supreme Court in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), and the preponderance of the evidence standard applicable in IPR, IBM presented sufficient proofs that a POSITA would be motivated to combine Matsuzaki and Dworkin, and the PTAB's conclusion to the contrary is not supported by substantial evidence.

# ARGUMENT

## I.    Legal Standards

A petition for *inter partes* review may be granted if the petition shows there is "a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  35 U.S.C. § 314(a).   Once an *inter partes* review has been instituted, a petitioner such as IBM has the burden of proving unpatentability by a preponderance of the evidence.  35 U.S.C. § 316(e).

A claim in an IPR "shall be given its broadest reasonable construction in light of the specification of the patent in which it appears."  37 C.F.R. § 42.100(b); *Microsoft Corp. v. Proxyconn, Inc.*, __ F.3d __, 2015 WL 3747257, at *2 (June 16, 2015).  This Court reviews the PTAB's "ultimate claim constructions *de novo* and its underlying factual determinations involving extrinsic evidence for substantial evidence."  *Microsoft*, 2015 WL 3747257, at *2 (citing *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015)).

The PTAB's determination of obviousness is reviewed *de novo*, and any underlying factual findings are reviewed for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000); *see also Microsoft*, 2015 WL 3747257, at *2 ("As a general matter, we review the [PTAB]'s

conclusions of law *de novo* and its findings of fact for substantial evidence."). Substantial evidence is more than a "mere scintilla" of evidence, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d at 1312 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)). A substantial evidence review must "tak[e] into account evidence that both justifies and detracts from an agency's decision." *Id.* Where the PTAB "relie[s] on erroneous reasoning in making the factual determinations," those factual findings are not supported by substantial evidence. *In re Huai-Hung Kao*, 639 F.3d 1057, 1065 (Fed. Cir. 2011).

"[W]hether there is a reason to combine prior art references is a question of fact." *Rambus Inc. v. Rea*, 731 F.3d 1248, 1252 (Fed. Cir. 2013). However, determining whether the PTAB applied the correct legal standard for finding a motivation to combine is a question of law reviewed *de novo*. *Cf. Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 964 (Fed. Cir. 2015) (holding whether Trademark Trial and Appeal Board "applied the correct legal standard . . . is a question of law we review *de novo*" and finding the Board did not apply the correct two-part test to determine whether a mark was generic).

21

## II.    The PTAB's Construction Of The "Wherein" Clause Was Legally Erroneous, Both Substantively And Procedurally.

The PTAB erred as a matter of law when it construed an entirely new claim element, the "wherein" clause, in its Final Written Decision. The parties conducted the entire IPR proceeding under the construction of "feedback" stated in the PTAB's Institution Decision. The PTAB's ultimate construction of the "wherein" clause in which "feedback" appears was not based upon the intrinsic evidence or any argument presented by either party in its briefing of the issues. The PTAB also violated its own rules and binding decisions when construing the "wherein" clause. Under this Court's *de novo* review of claim construction, *Microsoft*, 2015 WL 3747257, at *2, which controls here, the PTAB's construction should be reversed or, at a minimum, vacated and remanded.

### A.    The PTAB's New Construction Of The "Wherein Clause" Is Not The Broadest Reasonable Interpretation And Is Not Supported By The Evidence.

The PTAB's construction of the "wherein" clause, announced for the first time in the Final Written Decision, is not the broadest reasonable construction of that claim element. *See* 37 C.F.R. § 42.100(b) (terms in an IPR are to be given their broadest reasonable

22

construction in light of the specification); *Microsoft*, 2015 WL 3747257 at \*2; *In re Cuozzo Speed Techs, LLC*, No. 2014-1194, __ F.3d __, 2015 WL 4097949, at \*7-8 (Fed. Cir. July 8, 2015).

Prior to oral argument, the PTAB ruled—and the parties accepted—that "feedback" meant "transmitted back," nothing more. A8-9. Then in the Final Written Decision, the PTAB construed the entire "wherein" clause in which "feedback" appears to mean "the output values of the multiplication unit, the addition unit, and the sign inversion unit are feedback to the arithmetic controller, although those values may pass, unchanged, through intermediate components (e.g. latches and multiplexers)." *See* A9.

The PTAB did not identify anything in the '666 patent that supported its new and narrow construction of the "wherein" clause, instead making the conclusory statement that its new construction, based upon IV's new attorney argument at the oral hearing, "is consistent with the plain language of the claims and the Specification." A9. Even assuming the claims and specification of the '666 patent are ***consistent*** with this construction, "consistency" is not the claim construction standard for an IPR (or in any other proceeding)—rather

the ***broadest reasonable construction*** in light of the specification is. 37 C.F.R. § 42.100(b); *Microsoft*, 2015 WL 3747257 at *2; *In re Cuozzo*, 2015 WL 4097949, at *7-8.

In any event, the PTAB's construction of the "wherein" clause is ***not*** "consistent" with the intrinsic record. The claims of the '666 patent state that the outputs of the arithmetic units are feedback to the arithmetic controller, with no mention whatsoever of either unchanging values or passing through intermediate components. A58. IV itself argued that "nothing in the specification disavows a broader scope or otherwise limits the scope" of "feedback." A291. And while the '666 patent specification ***might*** be argued to suggest, in one embodiment depicted in Figure 2, that the outputs of the arithmetic units (temp_data) ***may*** go to the arithmetic controller without passing through any intermediate components or undergoing any changes in value, there is no requirement that the temp_data ***must*** be unchanged. A46, A54. To impose a requirement on the "wherein" clause that the "feedback" remain unchanged is to improperly import a limitation from an embodiment described in the specification. *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005) ("In examining

the specification for proper context, however, this court will not at any time import limitations from the specification into the claims."); *In re Am. Academy of Science Tech Center*, 367 F.3d 1359, 1369 (Fed. Cir. 2004); *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1368-69 (Fed. Cir. 2004) (reversing district court's claim construction for improperly importing limitation from specification into the claims). This is true even if the specification only recites a single embodiment. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

The PTAB also stated that its final construction is consistent with the testimony of IBM's expert. A9. Again, whether or not the PTAB's construction is "consistent" with the evidence is not the key issue— whether it is the ***broadest reasonable construction*** in view of the specification is. 37 C.F.R. § 42.100(b); *Microsoft*, 2015 WL 3747257 at *2; *In re Cuozzo*, 2015 WL 4097949, at *7-8. At most, Dr. Koç's testimony recognizes that the output of the arithmetic units ***may*** pass through intermediate components, as he testified that the temp_data signals in the '666 patent are multiplexed from the arithmetic units to the arithmetic controller. A731; A433-434; *see* A9. But his testimony in

no way supports the PTAB's conclusion that the outputs **must** be "unchanged." IV's expert does not offer any support for the PTAB's final, narrow construction either, as he consistently testified that the proper construction of feedback was simply "transmitted back." A946. In any event, such extrinsic evidence should not be used to alter the broadest reasonable construction in light of the specification. *See* 37 C.F.R. § 42.100(b); *Microsoft*, 2015 WL 3747257 at *2; *In re Cuozzo*, 2015 WL 4097949, at *7-8.

The broadest reasonable construction of "feedback" is the construction the PTAB originally applied in the Institution Decision, with which the parties agreed and which they applied in the POR and Reply. If the PTAB determined it needed to construe the entire "wherein" clause, and not just "feedback," it needed to determine the broadest reasonable construction of the "wherein" clause, grounded in the intrinsic evidence. It did not do so.

**B.    The PTAB Improperly Construed The "Wherein" Clause Based Upon Arguments Raised For The First Time At The Oral Hearing, After All Briefing Was Closed.**

The PTAB also erred by changing its construction based upon argument raised after all briefing was closed. By the time of the oral

hearing, there was no disputed issue regarding the construction of "feedback" left to be decided by the PTAB. The PTAB determined in its Institution Decision that "feedback" does not need to be directly transmitted back. A259. IV and its expert agreed that "feedback" simply means "transmitted back." A291-292; A946. IBM did not challenge the PTAB's construction, as stated by IV's expert, in its Reply. A9.

At the oral hearing, IV's counsel was asked by one of the PTAB's Administrative Law Judges how he was construing feedback. Counsel for IV responded: "Feedback is, *as I believe there is no dispute over*, means sent back, sent back to the arithmetic controller." A407. Yet in response to a further question about whether "feedback" should be limited to direct feedback, IV's counsel apparently realized the question had offered an opening. He changed course and advocated for an additional restriction on what would constitute "feedback:"

> I don't believe that there is any requirement that feedback be direct necessarily. However, what I would say is, to the extent you are suggesting that an indirect feedback could include where an output exits one arithmetic unit, enters another, and then the output of that arrives at the controller, somehow that would be feedback, the answer to that would be, well, that would no longer be the output of the multiplication unit, the addition unit or the sign inversion

unit.  That would be a new result.  That would be a new calculation.  It would be the output of that additional unit.

A407; *see also* A407-408 (the feedback "wouldn't be entering another arithmetic logic unit before it was received by the controller").

Prior to this statement at the oral hearing, IV had never offered any argument regarding the proper construction of "feedback" (other than to say it should not be limited to direct feedback) or of the "wherein" clause.  IBM's counsel timely objected to IV's argument as new lawyer argument.  A423-424.

A reviewing court shall "set aside agency action, findings, and conclusions" that are "without observance of the procedure required by law."  5 U.S.C. § 706(2)(D).  At an oral hearing, the parties "may rely upon evidence that has been previously submitted in the proceeding and ***may only present arguments relied upon in the papers previously submitted***.  ***No new evidence or arguments may be presented at the oral argument***."  Patent Trial Practice Guide, 77 FED. REG. 48756, 48768 (Aug. 14, 2012).  "At [the oral hearing] stage, the trial is already completed, and the final oral hearing is not an opportunity to add anything to a party's case. Whatever a party desires to present, for whatever reason, should have already been presented in

the party's petition, response, opposition, motion, reply, declarations, observations on cross-examination, or other exhibits presented at an appropriate time during the trial." A1358-1359 (*CBS Inter. v. Helferich Pat. Licen.,* IPR2013-00033, Paper 118 (PTAB Oct. 23, 2013)).[2]

The PTAB **admitted** that IV's new argument regarding whether feedback can pass, unchanged, through additional arithmetic units before entering the arithmetic controller was never before presented in any party's briefing. A9 ("[i]n response to questioning at the hearing, however, [IV] qualified its argument" as to the meaning of "feedback."). Nonetheless, in violation of its own rules and binding decisions, the PTAB relied upon this new argument and construed the "wherein" clause in its Final Written Decision. *Id*.

Neither the parties nor the PTAB had ever proposed a construction for the "wherein" clause prior to the oral hearing. Nor had anyone offered ***any*** argument regarding whether the feedback must remain ***unchanged*** between being output from the multiplication,

---

[2]  Though not a precedential decision, *CBS* was binding on the PTAB and the parties in this proceeding as at least the law of the case, because the PTAB directed the parties to *CBS* "regarding the appropriate content" for the oral hearing. A360.

addition, and sign inversion units and entering the arithmetic controller. At the oral hearing, counsel for IV pointed to Figure 2 of the '666 patent as allegedly supporting its new argument. A407-408. The only other time IV referenced Figure 2 of the '666 patent was when it provided an overview of the '666 patent in its POR—it never referenced Figure 2 in connection with any argument regarding the proper construction of "feedback" or the "wherein" clause. A286-287. The proper construction of the "wherein" clause was never before the PTAB to be considered, and thus the PTAB's new construction was improper and should be rejected. *See Rambus*, 731 F.3d at 1255 (holding PTO must ensure parties are fairly treated before it by providing notice of all matters of fact and law to be decided prior to a hearing before the PTAB); *cf. Lazare Kaplan Int'l, Inc. v. Photoscribe Techs, Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) (finding plaintiff waived a claim construction argument raised for the first time in a post-trial motion).

IBM brought out these points in its Request for Rehearing. In denying IBM's Request, the PTAB stated that it based its construction upon evidence presented in the Petition and POR, and not an improperly raised new argument. A35. This is demonstrably incorrect.

30

The PTAB did not cite to any evidence or argument from the Petition or POR when stating its new construction of the "wherein" clause in the Final Written Decision. A9. Nor did the PTAB identify any intrinsic or extrinsic evidence supporting its construction of the "wherein" clause. *Id*. Instead, the PTAB cited ***IV's statements from the oral hearing***, and then said this new construction was "consistent with" the claims, specification, and testimony of IBM's expert. *Id*.

The PTAB also denied IBM's Request for Rehearing because IBM allegedly did not object to IV's new argument during the oral hearing, and, if IBM did object, "that objection is overruled." A35-36. This is wrong on both fronts. The PTAB instructed the parties not to interrupt the argument with objections, and to raise the objections during their own argument. A367. IV did not make its new argument until its ***responsive*** oral argument, and IBM voiced its objections to IV's new argument during IBM's rebuttal argument. A423-424. The PTAB's comment in its Decision on Rehearing that IBM failed to make an objection in its ***main*** argument is thus nonsensical, as IV did not make its improper new argument until ***after*** IBM's main argument was complete. A36. The PTAB was also wrong to overrule IBM's objection.

The PTAB offered no justification for ignoring its own rules and binding decisions to not only solicit and allow new argument to be presented, but to have that new argument form the substantive basis of its ultimate patentability decision.

By not following its own rules and binding decisions, the PTAB deprived IBM of any opportunity to respond to the new claim construction argument. *See Rambus*, 731 F.3d at 1255 (a party before the PTAB must have "an adequate opportunity to respond to the [PTAB]'s findings during the PTO proceeding"); *In re Leithem*, 661 F.3d 1316, 1320 (Fed. Cir. 2011) (holding that "fairness dictates" that a patent applicant "should be afforded an opportunity to respond" to new arguments raised by PTAB in appeal of examiner's rejection); *see also* A1376 (*TRW Automotive U.S. LLC v. Magna Electronics Inc.*, IPR2014-00262, Paper 37 (PTAB June 25, 2015)) (declining to consider argument raised in reply, as failure to raise argument earlier "deprived Magna of the opportunity to respond to it").

IBM was not given the opportunity to respond to the final claim construction formulated by the PTAB. This inequitable result is the very reason why new arguments are prohibited at the oral hearing.

## III. The PTAB's Conclusion That Dworkin Did Not Teach "Feedback" Was In Error.

The PTAB relied upon its improper and belated construction of the "wherein" clause to conclude that the combination of Matsuzaki and Dworkin does not render the claims of the '666 patent unpatentable. A21. At minimum, this Court should remand the issue of whether Dworkin teaches "feedback" to the PTAB for further consideration if it reverses the PTAB's construction of the "wherein" clause. Remand is not necessary, however, because under the proper construction of the claims, IBM demonstrated by a preponderance of the evidence that Dworkin teaches "feedback" and the combination of Matsuzaki and Dworkin teaches the "wherein" clause.

The PTAB's ultimate conclusion of obviousness is reviewed *de novo* by this Court, while any underlying factual findings are reviewed for substantial evidence. *In re Gartside*, 203 F.3d at 1316. Although "the differences between the claimed invention and the prior art" is a question of fact, *see id.* at 1319, "only when a claim is properly understood can a determination be made. . . whether the prior art anticipates and/or renders obvious the claimed invention." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351

(Fed. Cir. 2001).   This Court reviews the PTAB's construction of "feedback" and the "wherein" clause *de novo*.   *Microsoft*, 2015 WL 3747257, at *2.

The PTAB agreed with the parties' explanation of Dworkin's "shift left" operation, and for purposes of this appeal, IBM does not dispute the PTAB's factual findings regarding how Dworkin operates as set forth in the Final Written Decision.   IBM's dispute is with the PTAB's finding that Dworkin's "shift left" operation does not disclose "feedback," such that the combination of Matsuzaki and Dworkin does not disclose the "wherein" clause and does not render the claims of the '666 patent obvious.   The PTAB's conclusion that Dworkin does not teach "feedback" must have been based upon its new construction of the "wherein" clause, even if it did not expressly state that it was applying that construction to Dworkin.   *See, e.g.*, A15-16 (finding that "Matsuzaki does not disclose the feedback limitation of claims 1 and 4" because it changes the values of the outputs).   But the PTAB's construction of the "wherein" clause is subject to this Court's *de novo* review, and is riddled with problems: (i) it is not the ***broadest reasonable*** construction; (ii) it is not supported by the '666 patent claims or specification; and (iii) it is

based upon IV's untimely arguments. The PTAB's conclusion that Dworkin does not disclose "feedback" cannot stand when based upon the PTAB's improper and incorrect construction of the "wherein" clause.

The "shift left" operation of Dworkin satisfies the PTAB's original—and correct— construction of "feedback" to mean "transmitted back." Each sub-ALU 18 in Figure 2 of Dworkin, which also corresponds to each box 70 in Figure 6, performs a portion of the desired calculation, and then shifts the result of its calculation one bit to the left. A18-19. For the left-most sub-ALU 18, the result of its calculation is shifted directly to the controller. A19. For the other sub-ALUs 18, the results of their calculations are shifted into the sub-ALU 18 immediately to their left. *Id.* This process repeats until the calculation is complete and all of the data has been shifted to the controller. A19-20. Thus the output of each sub-ALU 18 other than the left-most sub-ALU 18 is not **directly** transferred back to the controller, but each output does reach the controller through consecutive iterations of the "shift left" operation. Each output from a sub-ALU 18 just passes through additional sub-ALUs 18 on its way to the controller, and is part of a value that is output from the left-most sub-ALU 18.

This is illustrated by Figure 6 of Dworkin and its related text, which IV relied upon heavily for its explanation of Dworkin's operation.



**FIG. 6**

A97. In Figure 6, boxes 70(i), 70(i-1) and 70(i-2) are sub-ALUs. *Id*. $C_j$ is the output of the left-most sub-ALU 18 (box 70(i)), which is transmitted directly to the controller. *Id*. $C_{j-1}$ is the output of the second from the left sub-ALU 18 (box 70(i-1)). *Id*. $C_j$ is a combination of the calculations performed in the left-most sub-ALU 18 ($b_i(a_i)$ and $c_{n-1}(m_j)$) and the output of the sub-ALU 18 to its right ($c_{j-1}$). *Id.*; A106 (left-most sub-ALU 18 (box 70(i) in Figure 6) "implement[s] the expression '$c_j=c_{j-1}+b_i(a_i)+c_{n-1}(m_j)$'"). In other words, the output from the second from the left sub-ALU 18, $c_{j-1}$, is transmitted to the controller when it is

36

output from the left-most sub-ALU 18 in the expression $c_j = c_{j-1} + b_i(a_i) + c_{n-1}(m_j)$. A106.

That Dworkin's "shift left" operation satisfies the proper broadest reasonable interpretation of "feedback" is not surprising, given that it is equivalent to the '666 patent's multiplexing. IV's expert testified that because the multiplication, addition, and sign inversion units in the '666 patent are sharing one communication line, the outputs of those units must be multiplexed so that they can travel over that communication line without colliding. A874-875. Dr. Koç explained that because the outputs of each sub-ALU 18 in Dworkin also share a communications path to controller 20, those outputs must be able to travel over that communications path without colliding, which is achieved through the "shift left" operation. A731-732.

Any conclusion that Dworkin does not teach that the outputs of all sub-ALUs 18 are "transmitted back" to the controller is not supported by substantial evidence in light of the preponderance of the evidence standard applicable in IPR.

IV.    **The PTAB's Conclusion That IBM Did Not Present A *Prima Facie* Case Of Obviousness, Measured By The Preponderance Of The Evidence Standard, Was Not Supported By Substantial Evidence And Was Premised On A Legal Error.**

In *KSR Int'l Co. v. Teleflex Inc.*, the U.S. Supreme Court rejected the Federal Circuit's "formalistic conception of the words teaching, suggestion, and motivation." 550 U.S. 398, 419 (2007). The Court held that:

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. To facilitate review, this analysis should be made explicit.

*Id.* at 418. "[I]n many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 420.

In spite of the flexible analysis adopted by the Supreme Court for determining obviousness, and the preponderance of the evidence standard applicable in IPR, the PTAB applied an improperly high and rigid burden on IBM to show a motivation to combine Matsuzaki and Dworkin. The PTAB faulted IBM for allegedly not showing **how**

Matsuzaki could, and *why* Matsuzaki would, be modified by the teachings of Dworkin. A16-17, A21-30. The PTAB's finding that IBM failed to demonstrate a motivation to combine is premised on incorrect law and is not supported by substantial evidence.

> **A.** **The PTAB Erred When It Faulted IBM For Allegedly Failing to Show "How" A POSITA Would Have Modified Matsuzaki Based on Dworkin's Teachings.**

An obviousness analysis does not require a showing that the references could be physically combined, but rather asks "whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole." *In re Chevalier*, 500 F. App'x 932, 934 (Fed. Cir. 2013) (citing *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (*en banc*)); *see also In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements."); *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference").

Here, the PTAB wrongfully expected IBM to show *how* a POSITA could *physically* replace the multiplication, addition, and sign inversion units, along with their outputs, taught in Matsuzaki with the computational units and their outputs taught in Dworkin.  A16-17. This Court should reject the PTAB's finding that IBM did not present sufficient evidence that the multiple computational units providing feedback to a controller taught by Dworkin could be physically combined with the multiplication, addition, and sign inversion units taught by Matsuzaki, because this finding is based upon a requirement that does not exist in the law.  *See* 5 U.S.C. § 706(2)(A) (a reviewing court shall "set aside agency action, findings, and conclusions" that are "not in accordance with the law").

In denying IBM's Request for Rehearing on this point, the PTAB claimed that it did not require IBM to show that Matsuzaki and Dworkin could be physically combined, but rather based its finding on its contention that IBM argued for the first time in Reply that Dworkin discloses multiple generic computational units.  A39-40; A16.  That justification is not sustainable.  IBM expressly stated in the Petition that "Dworkin teaches multiple computational arithmetic units, sub-

ALU's 18." A188; *see also* A183. The PTAB recognized this in its Institution Decision, where it correctly observed IBM's argument to be that "each of Dworkin's sub-ALUs is a separate computational unit." A264.

The PTAB was also wrong to conclude that IBM never argued "that Matsuzaki could be modified by feeding the outputs of its three arithmetic units back to the controller by applying a teaching of Dworkin to feed the outputs of multiple generic computational units directly to a controller." A16-17. IBM explained in the Petition that Matsuzaki arguably did not teach the feedback of outputs (plural) from the multiplication, addition, and sign inversion units. A183. Plural outputs is a common feature, however, and is "disclosed by Dworkin when it describes several computational arithmetic units" that output values that are fed back to a controller. *Id.*; *see also* A504-505.

This Court reviews whether the PTAB applied the correct legal standard *de novo*. *Cf. Princeton Vanguard*, 786 F.3d at 964. The PTAB "relied on erroneous reasoning in making the factual determinations" that Matsuzaki and Dworkin could not be physically combined and that IBM had never shown that they could be; thus, those factual findings

41

are not supported by substantial evidence and should be rejected. *See In re Huai-Hung Kao*, 639 F.3d at 1065.

## B. The PTAB's Finding That IBM Did Not Explain "Why" A POSITA Would Have Combined Matsuzaki And Dworkin Is Not Supported By Substantial Evidence

The PTAB's finding that IBM did not demonstrate a motivation to combine Matsuzaki and Dworkin, considering the preponderance of the evidence standard applicable in IPR proceedings, is not supported by substantial evidence. IBM offered evidence of multiple reasons, sufficient to satisfy that standard, why a POSITA could have, and indeed would have, been motivated to combine Matsuzaki and Dworkin.

"*KSR* expanded the sources of information for a properly ***flexible*** obviousness inquiry to include market forces; design incentives; the 'interrelated teachings of multiple patents'; 'any need or problem known in the field of endeavor at the time of invention and addressed by the patent'; and the background knowledge, creativity, and common sense of the person of ordinary skill." *Perfect Web Techs, Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) (citing *KSR*, 550 U.S. at 418-21). The "interrelated teachings of multiple patents" should be considered "in order to determine whether there was an apparent reason to

combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418. An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 420-421. Rigid rules regarding a motivation to combine are neither necessary nor consistent with case law. *Id.* at 421; *Perfect Web*, 587 F.3d at 1329.

As IBM stated in its Petition, Matsuzaki and Dworkin "both . . . address hardware implementations of fast cryptographic co-processors." A197; *see also* A517-518 ("Matsuzaki and Dworkin address the same problem: optimal hardware implementation of a cryptographic co-processor"). Matsuzaki and Dworkin both "teach Montgomery reduction, similar methods of processing cryptographic data, and internal control methodology." A197.

IBM's expert, Dr. Koç, explained the reasons a person of ordinary skill in the art would combine Matsuzaki and Dworkin, in detail: "One having ordinary skill in the art would look to combine Matsuzaki and

43

Dworkin because they both teach hardware implementations of Montgomery reduction," which is "a ***very specific element*** of cryptographic computations." A518. Matsuzaki and Dworkin "teach similar processing methods for cryptographic data" and "describe similar ways to control what arithmetic computations are performed by the arithmetic unit." A518-519. "Based upon all of these specific similarities, as well as common sense, one having ordinary skill in the art ***would have combined*** Matsuzaki and Dworkin to render obvious the alleged invention of claims 1 and 4" of the '666 patent. A519; *see also* A197. "The common teachings of these two references—hardware implementation, Montgomery reduction, data routing, and processing controls—provide ample rationale for one having ordinary skill in the art to combine them." A519.

The PTAB found that IBM's recitations were just descriptions of the similarities between the references, and did not provide a reason to combine Matsuzaki and Dworkin. A23-26; A41. Taking into account ***all*** of the evidence, as the law mandates, this finding is not supported by substantial evidence, especially gauged by the preponderance of the evidence standard applicable in IPR. *See In re Gartside*, 203 F.3d at

1312 (substantial evidence review must "tak[e] into account evidence that both justifies and detracts from an agency's decision").

Dr. Koç did not just state that the prior art references were similar, he testified that a POSITA *would* have combined these references because of their *numerous* similarities. A519. The PTAB erred when it ignored Dr. Koç's evidence of "the knowledge and perspective of one of ordinary skill in the art" because that evidence provides "critical background information that could easily explain why an ordinarily skilled artisan would have been motivated to combine or modify the cited references to arrive at the claimed invention[]." *See Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (holding the PTAB erred in finding that four prior art references could not be combined, because the PTAB's analysis was narrowly focused on the prior art references and did not account for the knowledge and perspective of a POSITA).

The PTAB's reliance on *InTouch Technologies, Inc. v. VGo Communications, Inc.*, 751 F.3d 1327 (Fed. Cir. 2014), in support of its finding is misplaced. There, VGo's expert misrepresented the teachings of the prior art (*id.* at 1350), offered only vague testimony (*id.* at 1351),

45

and failed to consider both what a POSITA would have known at the time of the invention and secondary considerations of nonobviousness (*id.* at 1352). VGo's expert also repeatedly testified that a POSITA **could** combine two references, and never said that he or she **would**. *Id.* at 1349, 1352, 1353. In contrast, Dr. Koç identified specific reasons why a POSITA **would** combine Matsuzaki and Dworkin. A518-519. Nor was there any evidence that Dr. Koç's testimony suffered any of the other shortcomings in evidence that VGo's expert committed that would lead a factfinder to discount his testimony.

The PTAB dismissed as a matter of law Dr. Koç's testimony that a POSITA would have used his or her common sense when looking at Matsuzaki and Dworkin, and that **common sense would have motivated** the individual to combine the two. A25-26; *see* A519. The PTAB held that common sense only applies in the absence of expert testimony, and expert testimony was necessary due to the complicated technology presented in the '666 patent. A26. There is no such rule of law. An obviousness analysis "may include recourse to logic, judgment, and **common sense available to the person of ordinary skill** that do[es] not necessarily require explication in any reference or expert

46

opinion." *Perfect Web*, 587 F.3d at 1329; *see also InTouch*, 751 F.3d at 1353 (a court may "rely upon the common sense of one of ordinary skill in the art"). Dr. Koç was entitled to determine that a POSITA **would** have been motivated to combine Matsuzaki and Dworkin applying, *inter alia*, his common sense. The PTAB's complete dismissal of this aspect of IBM's expert's testimony was legal error. *See I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 987-91 (Fed. Cir. 2014) (concluding district court erred in failing to use "common sense" to bridge differences between prior art and claims); *Duramed Pharm., Inc. v. Watson Labs., Inc.*, 413 F. App'x 289, 294 (Fed. Cir. 2011) (finding district court wrongly granted summary judgment of nonobviousness when it failed to consider common sense).

Finally, the PTAB also erred in the level of detail that it required from IBM and its expert to identify and explain a motivation to combine. The PTAB relied upon language from *KSR* that "analysis should be made explicit," and found IBM's evidence lacking for not being sufficiently explicit. A27-28 (*citing KSR*, 550 U.S. at 418). But the requirement that the analysis be made explicit, as stated in *KSR*, is an instruction to the lower courts to explain their reasoning when

making findings regarding obviousness.  *Perfect Web*, 587 F.3d at 1330. It was not setting out an evidentiary burden to be applied to parties and the teachings of the prior art.  *Id*.  To impose this "explicit analysis" standard on litigants would undermine the instruction in *KSR* that the obviousness analysis be "expansive and flexible."  *KSR*, 550 U.S. at 415. Similarly, Dr. Koç was not required to explain to some requisite level of detail how a POSITA would have applied his or her common sense.  *See Perfect Web*, 587 F.3d at 1329 (an obviousness analysis "may include recourse to logic, judgment, and common sense available to the person of ordinary skill ***that do not necessarily require explication in any reference or expert opinion***.").

The PTAB's conclusion that IBM did not demonstrate a sufficient motivation to combine Matsuzaki and Dworkin was based upon an improperly strict interpretation, both of the law regarding the motivation to combine prior art references and of IBM's burden at the PTAB to demonstrate obviousness under a preponderance of the evidence standard.  It is not based upon substantial evidence, as this Court's review requires.

## CONCLUSION

The PTAB's conclusion that the '666 patent was not unpatentable should be reversed. The PTAB's construction of the "wherein" clause was legally erroneous. Its holding that Dworkin did not teach "feedback," such that the combination of Matsuzaki and Dworkin did not render the claims of the '666 patent obvious, was premised on the PTAB's legally erroneous construction of the "wherein" clause. IBM demonstrated by a preponderance of the evidence that Dworkin teaches "feedback" as that term is properly construed. The PTAB's findings regarding the motivation to combine Matsuzaki and Dworkin is not supported by substantial evidence, viewed in light of the flexible obviousness analysis adopted by the Supreme Court in *KSR* and the preponderance of the evidence standard applicable in IPR.

This Court should hold the '666 patent obvious over the combination of Matsuzaki and Dworkin, or remand to the PTAB for consideration under the proper claim constructions, legal standards, and evidentiary burdens.

Dated:  July 31, 2015                    Respectfully submitted,

                                         /s/  *Kenneth R. Adamo*
                                         **KIRKLAND & ELLIS LLP**

                                         Kenneth R. Adamo
                                         Brent P. Ray
                                         Eugene Goryunov
                                         Meredith Zinanni
                                         300 North LaSalle Street
                                         Chicago, Illinois 60654
                                         Tel: (312) 862-2000
                                         Fax: (312) 862-2200
                                         kradamo@kirkland.com
                                         brent.ray@kirkland.com
                                         eugene.goryunov@kirkland.com
                                         meredith.zinanni@kirkland.com

                                         John C. O'Quinn
                                         655 Fifteenth Street, N.W
                                         Washington, D.C. 20005
                                         Tel: (202) 879-5000
                                         Fax: (202) 879-5200
                                         john.oquinn@kirkland.com

# ADDENDUM

Trials@uspto.gov                                              Paper 50
Tel: 571-272-7822                                  Entered: April 3, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

INTERNATIONAL BUSINESS MACHINES CORPORATION,
Petitioner,

v.

INTELLECTUAL VENTURES II LLC,
Patent Owner.
_____

Case IPR2014-00180
Patent 7,634,666 B2
_____

Before MIRIAM L. QUINN, DAVID C. McKONE,
and JAMES A. TARTAL, *Administrative Patent Judges*.

McKONE, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-00180
Patent 7,634,666 B2


I.  INTRODUCTION

   *A. Background*

   International Business Machines Corp. ("Petitioner") filed a Petition
(Paper 1, "Pet.") to institute an *inter partes* review of claims 1–11 of
U.S. Patent No. 7,634,666 (Ex. 1005, "the '666 patent").  Intellectual
Ventures II LLC ("Patent Owner") filed a Preliminary Response (Paper 9,
"Prelim. Resp.").  Pursuant to 35 U.S.C. § 314, in our Decision to Institute
(Paper 10, "Dec."), we instituted this proceeding as to all of the challenged
claims of the '666 patent.

   After the Decision to Institute, Patent Owner filed a Patent Owner
Response (Paper 24, "PO Resp.") and Petitioner filed a Reply to the Patent
Owner Response (Paper 29, "Reply").  An oral hearing (Paper 49, "Tr.")
was held on January 13, 2015.


   *B. Related Cases*

   Patent Owner has asserted the '666 patent in several United States
district courts against various defendants.  Pet. 1–2; Paper 7, at 2–3.


   *C. References Relied Upon*

   Petitioner relies upon the following prior art references:

   US 6,963,644 B1 (issued Nov. 8, 2005, filed Apr. 6, 2000)
         ("Matsuzaki," Ex. 1008)

   US 6,009,450 (Dec. 28, 1999) ("Dworkin," Ex. 1012)

   Alexandre F. Tenca and Çetin K. Koç, *A Scalable Architecture for
         Montgomery Multiplication*, CHES '99, 1717 LNCS, 94–108
         (1999) ("Tenca," Ex. 1014)

2

IPR2014-00180
Patent 7,634,666 B2

### D. The Asserted Grounds

We instituted this proceeding based on the grounds of unpatentability set forth in the table below.  Dec. 26–27.

| References | Basis | Claims challenged |
|---|---|---|
| Matsuzaki and Dworkin | § 103(a) | 1 |
| Matsuzaki and Dworkin | § 103(a) | 4 |
| Matsuzaki, Dworkin, and Tenca | § 103(a) | 2, 5 |
| Matsuzaki, Dworkin, and Tenca | § 103(a) | 3, 6 |
| Matsuzaki, Dworkin, and the knowledge of one having ordinary skill in the art | § 103(a) | 7, 9 |
| Matsuzaki and Dworkin | § 103(a) | 8, 11 |
| Matsuzaki and Dworkin | § 103(a) | 10 |

### E. The '666 Patent

The '666 patent describes a co-processor, coupled to a host processor, for executing both Rivest-Shamir-Adleman ("RSA") and Elliptic Curve Cryptography ("ECC") public key encryption algorithms.  Ex. 1005, 1:6–11, 1:32–36.  The two encryption algorithms share a common arithmetic operation.  *Id.* at 1:25–26.

The co-processor includes a modular arithmetic unit and an interface control unit for interfacing between the arithmetic unit and the host processor.  *Id.* at Fig. 1, 2:64–66.  The interface control unit receives encryption key and operation code ("op-code") data from the host processor and outputs status and interrupt signals to the host processor.  *Id.* at 3:2–6.

3

IPR2014-00180
Patent 7,634,666 B2

The interface control unit includes a bus interface unit, a concatenation/split

unit, and a cryptographic controller with a modular-op-code generator. *Id.* at

Fig. 3, 3:40–43.

Figure 2 is reproduced below:



FIGURE 2

Figure 2 is a block diagram of a modular arithmetic unit. *Id.* at 2:29.

The modular arithmetic unit includes multiplication unit 15, addition

unit 16, and sign inversion unit 17 for performing arithmetic manipulations

related to encryption. *Id.* at Fig. 2, 3:12–14. The modular arithmetic unit

also includes static random access memory ("SRAM") block 13 for storing

data received from the host processor and loading them into the units that

perform arithmetic manipulations. *Id.* at Fig. 2, 3:11–12. The SRAM block

includes an address decoder, several SRAM elements for storing data,

4

an input switch (multiplexer 23), and several output switches (multiplexers 1–5). *Id.* at Fig. 4, 4:4–9. The modular arithmetic unit further includes a controller for controlling operation of the modular arithmetic unit. *Id.* at Fig. 2, 3:11–12.

As shown in Figure 2, outputs of the multiplication unit, the addition unit, and the sign inversion unit labeled "temp_data" are fed back to each of SRAM Block 13 and Controller 14. *Id.* at Fig. 2, 3:21–23, 3:29–39.

Claim 1, reproduced below, is illustrative of the claimed subject matter:

> 1. A crypto-engine for cryptographic processing of data comprising an arithmetic unit operable as a co-processor for a host processor and an interface controller for managing communications between the arithmetic unit and host processor, the arithmetic unit including:
>
> > a memory unit for storing and loading data, the memory unit including
> >
> > > an input switch for selecting input-interim data;
> > >
> > > a plurality of Static Random Access Memory elements for receiving and storing the input/interim data from the input switch;
> > >
> > > a plurality of output switches connected to the memory elements; and
> > >
> > > an address controller for controlling flow of the data through the switches and memory elements
> >
> > a multiplication unit, an addition unit and a sign inversion unit for performing arithmetic operations on said data, the multiplication

IPR2014-00180
Patent 7,634,666 B2

> unit, the addition unit and the sign inversion
> unit each having an output; and

an arithmetic controller for controlling the storing
and loading of data by the memory unit and
for enabling the multiplication, addition and
sign inversion units;

wherein the outputs of the multiplication unit, the
addition unit and the sign inversion unit are
feedback to the arithmetic controller.

## II. ANALYSIS

### A. Claim Construction

The Board interprets claims of an unexpired patent using the broadest
reasonable construction in light of the specification of the patent in which
they appear. *See* 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*,
778 F.3d 1271, 1279–81 (Fed. Cir. 2015). Claim terms generally are given
their ordinary and customary meaning, as would be understood by one of
ordinary skill in the art in the context of the entire disclosure. *See In re
Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

### 1. *"multiplication unit," "addition unit," and "sign inversion unit"*

Petitioner proposes the following constructions:

"multiplication unit": "a unit *solely* capable of performing
multiplication on input data.";

"addition unit":  "a unit *solely* capable of performing addition
on input data."; and

"sign inversion unit": "a unit *solely* capable of performing
additive inversion on input data."

IPR2014-00180
Patent 7,634,666 B2

Pet. 6–8 (emphases added).  In the Decision to Institute, we preliminarily determined that the multiplication, addition, and sign inversion units should not be limited to "solely" one function each, rejecting Petitioner's arguments that relied on the Specification and prosecution history of the '666 patent. Dec. 10–11.

In the Reply, Petitioner argues that our preliminary constructions were incorrect in light of the deposition testimony (Ex. 1036) of Lee Ming Cheng, Ph.D., an inventor named on the '666 patent.  Reply 14–15.  According to Petitioner, Dr. Cheng testified in a different proceeding that the multiplication unit depicted in Figure 5 of the '666 patent performs Montgomery multiplication, but that its components perform no other mathematical functions.  Reply 14 (citing Ex. 1036, 65:15–71:3, 71:14–22, 72:21–73:4, 74:7–18).

Assuming Petitioner's characterization of Dr. Cheng's testimony is correct, such testimony nevertheless would not support Petitioner's proposed constructions.  Dr. Cheng's testimony is limited to the technical details of Figure 5, an example described in the '666 patent.  Petitioner has not explained persuasively why the example of Figure 5 should limit the claims. *See In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1369 (Fed. Cir. 2004) ("We have cautioned against reading limitations into a claim from the preferred embodiment described in the specification, even if it is the only embodiment described, absent clear disclaimer in the specification.") (citations omitted).

In the Reply, Petitioner again points to the prosecution history of the '666 patent, arguing that it characterizes two arithmetic units of a Stojancic reference as performing multiplication, addition, and sign inversion.

IPR2014-00180
Patent 7,634,666 B2

Reply 15 (citing Ex. 1018, at 5). Petitioner argues that this is a disclaimer of multifunctional units. Reply 15. We are not persuaded. The portion of the prosecution history cited by Petitioner characterizes the prior art, not the scope of the claims. We agree with Patent Owner that this does not rise to the level of "clear and unmistakable disavowal." PO Resp. 8 (quoting *Biogen Idec, Inc. v. GalxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013)).

Accordingly, on the full trial record, we maintain our preliminary construction declining to limit "multiplication unit," "addition unit," and "sign inversion unit" to one function each.

### 2. "feedback"

Claim 1 requires "wherein the outputs of the multiplication unit, the addition unit and the sign inversion unit are feedback to the arithmetic controller." Petitioner proposes construing "feedback" to mean "a result that is *directly* transmitted back." Pet. 8 (emphasis added). In the Decision to Institute, we were not persuaded by Petitioner's arguments that the plain language of the claims and the Specification warranted such a construction, and declined to construe preliminarily the claims to include such a limitation. Dec. 11. Specifically, we recognized that the '666 patent describes an embodiment in which temporary data is fed back directly from the multiplication, addition, and sign inversion units to a controller. Dec. 11. This is shown in Figure 2, reproduced above, where "[t]he outputs . . . k-bit 'temp_data' of MMU 15/ MADU 16/SIU 17 go to Controller 14." Ex. 1005, 3:21–23. Nevertheless, on the record at that time, we declined to limit "feedback" based on an example of direct feedback in the Specification.

8

IPR2014-00180
Patent 7,634,666 B2

Dec. 11. Petitioner does not challenge our initial construction of "feedback" in its Reply.

In its Response, Patent Owner supports our preliminary construction in the Decision to Institute. PO Resp. 9. In response to questioning at the hearing, however, Patent Owner qualified its argument by noting that, if feedback is routed through intermediate components that change its value, the data would no longer be feedback of that value. Tr. 45:9–46:2. For example, if the value of the feedback from the multiplication unit changes before reaching the controller, it no longer would be output of the multiplication unit fed back to the controller. *Id.* Patent Owner's argument is consistent with the plain language of the claims and the Specification. It is also consistent with the testimony of Petitioner's Declarant, Dr. Çetin Koç, Ph.D., in support of Petitioner's Reply, who testifies that the temp_data signals of the '666 patent are multiplexed from the computational units to the controller. Ex. 1029 ("Koç Reply Decl.") ¶ 42.

In sum, we construe "wherein the outputs of the multiplication unit, the addition unit and the sign inversion unit are feedback to the arithmetic controller" to mean that the output values of the multiplication unit, the addition unit, and the sign inversion unit are feedback to the arithmetic controller, although those values may pass, unchanged, through intermediate components (e.g., latches and multiplexers).

### B. *Motions to Exclude*

#### 1. *Petitioner's Motion to Exclude*

Petitioner moves to exclude Exhibits 2003, 2004, and 2010(A)–(D), arguing that they are incomplete and inaccurate. Paper 35 (Pet. Mot. to

IPR2014-00180
Patent 7,634,666 B2

Exclude) 1–6.  We do not rely on these exhibits, however.  Accordingly, Petitioner's motion is moot.

Petitioner's Motion to Exclude is denied.

### 2.  *Patent Owner's Motion to Exclude*

Patent Owner moves to exclude Exhibit 1036, a transcript of the deposition of Dr. Cheng (discussed above) as irrelevant and cumulative. Paper 34 (PO Mot. to Exclude) 3–7.  Patent Owner argues that, in district court litigation, inventor testimony generally has little probative value.  *Id.* at 4–5.  As to Dr. Cheng's testimony in particular, Patent Owner contends that it does not relate to the meaning of a claim term in the art.  *Id.* at 5.  Patent Owner also argues that Dr. Cheng's testimony is cumulative of the testimony of Petitioner's Declarant, Dr. Koç (Ex. 1001, "Koç Decl.").  PO Mot. to Exclude 6–7.  Patent Owner's arguments do not show the Cheng deposition transcript to be unduly prejudicial under Federal Rule of Evidence 403.  Rather, Patent Owner's arguments go to the weight we should give to the evidence.  Accordingly, we decline to exclude Exhibit 1036.

Patent Owner moves to exclude Exhibits 1031, 1033, and 1035, which embody articles it argues Petitioner should have addressed in the Petition. PO Mot. to Exclude 7–10.  We do not rely on these exhibits, however. Accordingly, Patent Owner's motion is moot as to these exhibits.

Patent Owner further moves to exclude Paragraphs 26–43 of the Koç Reply Declaration (Ex. 1029), arguing that they are inconsistent with Dr. Koç's first Declaration and are not responsive to Patent Owner's Response.  PO Mot. to Exclude 10–13.  We do not rely on these paragraphs,

10

IPR2014-00180
Patent 7,634,666 B2

however.  Accordingly, Patent Owner's motion is moot as to these paragraphs.

Patent Owner's Motion to Exclude is denied.

### C. Obviousness Combinations Including Matsuzaki and Dworkin

#### 1. Overview of Matsuzaki

Matsuzaki describes a co-processor for performing ECC using Montgomery reduction.  Ex. 1008, Abstract, 7:40–45.  Montgomery reduction is an algorithm for performing high-speed modular arithmetic.  *Id.* at 7:57–67.

Figure 1 of Matsuzaki is reproduced below:



Figure 1 is a block diagram of a multi-word arithmetic co-processor that performs arithmetic calculations based on instructions from a host device.

IPR2014-00180
Patent 7,634,666 B2

*Id.* at 7:39–45, 7:53–56.  The co-processor includes a control unit, an arithmetic unit, a memory input/output unit, and a memory.  *Id.* at 7:48–51.

The memory input/output unit transfers data among the arithmetic unit, the memory, and an external device.  *Id.* at 8:31–35.  It includes an address generating unit and a bus switch with a plurality of selector circuits that connect data buses from the arithmetic unit to the memory according to instructions from the control unit.  *Id.* at Fig. 3, 9:43–53.  The memory includes two dual-port memories that store data on which arithmetic is performed, as well as intermediate calculation results.  *Id.* at Fig. 1, 8:17–25.

12

IPR2014-00180
Patent 7,634,666 B2

Figure 17, reproduced below, is an example of an arithmetic unit:

FIG. 17



Figure 17 is a block diagram of circuity for an arithmetic unit. *Id.* at 7:26–28. The arithmetic unit can include multiplier 21, adder 22, and sign inverting unit 51. *Id.* at Fig. 17, 19:1–13. The arithmetic unit performs calculations on data from the memory pursuant to instructions from control unit 10. *Id.* at 10:10–18. The output of adder 22 is feedback to control unit 10. *Id.* at 9:5–12. As can be seen from Figure 17, however, the outputs of

13

IPR2014-00180
Patent 7,634,666 B2

multiplier 21 and sign inverting unit 51 are inputs to adder 22, rather than feedback to control unit 10.

### 2. Overview of Dworkin

Dworkin describes a processor for performing finite field and integer arithmetic for ECC and RSA cryptography. Ex. 1012, 1:5–6, 1:26–33, 1:36–38. Figure 2 is reproduced below:



*FIG. 2*

Figure 2 illustrates an arithmetic-logic unit ("ALU") for performing the arithmetic calculations of the processor, including finite field and integer arithmetic. *Id.* at 2:46–47, 3:1–5. The ALU includes several sub-ALUs 18 that perform functions such as XOR, shift left, shift right, XOR-shift, integer add, and integer subtract. *Id.* at 3:41–44. According to Petitioner's declarant, Dr. Çetin Koç, one of the operations disclosed in Dworkin is Montgomery reduction. Ex. 1001 ¶ 146 (citing Ex. 1012, 7:21–38).

The ALU includes special purpose registers 16 and controller 20. The controller sequences the steps of a computational operation to be performed

14

IPR2014-00180
Patent 7,634,666 B2

by the ALU pursuant to control bits stored in the special purpose registers.
Ex. 1012, 3:6–17.

### 3. *Petitioner has not shown that Matsuzaki and Dworkin teach the Claimed Feedback*

Petitioner contends that claim 1 would have been obvious over Matsuzaki and Dworkin. Specifically, Petitioner argues that: Matsuzaki's arithmetic device is a co-processor and the external device it communicates with is a host processor (Pet. 23–24); Matsuzaki's memory input/output unit, in particular the bus switch, is an input switch and a plurality of output switches (*id.* at 24–26); Matsuzaki's address generating unit is an address controller (*id.* at 27); Matsuzaki's arithmetic unit, specifically the embodiment shown in Figure 17, includes a multiplication unit, an addition unit, and a sign inversion unit (*id.* at 27–28); and Matsuzaki's control unit is an arithmetic controller (*id.* at 28–29).

With regard to the feedback limitation, Petitioner argues that Matsuzaki's carry-up signal (Ex. 1008, 9:54–63, Fig. 1) feeds information from the arithmetic unit back to the control unit, which Petitioner contends is an arithmetic controller. Pet. 29–30. Petitioner concedes, however, that "[t]he only element of independent claim 1 one could argue is not taught by Matsuzaki, in combination, as claimed, is that 'outputs' (plural) of the multiplication unit, the addition unit, and the sign inversion unit are directly sent back to the arithmetic controller." *Id.* at 17; *accord* Ex. 1001 ¶ 116. As can be seen in Figure 17 (reproduced above) the outputs of the multiplier and sign inversion unit are fed to the adder, rather than the controller. The adder operates on (and, thus, changes) those values and outputs a single

15

IPR2014-00180
Patent 7,634,666 B2

feedback to the controller.  Thus, we find that Matsuzaki does not disclose the feedback limitation of claims 1 and 4.

Nevertheless, Petitioner contends that the feedback limitation is taught by Dworkin, and that a person of ordinary skill in the art would have combined Matsuzaki and Dworkin.  Pet. 17.  In the Petition, Petitioner, relying on Dr. Koç, contended (with reference to Figure 2 of Dworkin) that a first sub-ALU 18 corresponds to a multiplication unit, a second sub-ALU 18 corresponds to an addition unit, and a third sub-ALU 18 corresponds to a sign inversion unit, and that each of these sub-ALUs directly sends back its output to controller 20.  *Id.* at 30–31 ("Dworkin discloses wherein the outputs of the multiplication unit (e.g., sub-ALU 18), the addition unit (e.g., sub-ALU 18) and the sign inversion unit (e.g., sub-ALU 18) are directly sent back to the arithmetic controller (e.g., controller 20)."); Ex. 1001 ¶¶ 117–18.

Patent Owner argues that this is a mischaracterization of Dworkin; for example, Dworkin does not disclose a sign inversion unit.  PO Resp. 13.  Petitioner now concedes that Dworkin does not disclose each of these arithmetic units and, indeed, claims it never made such an assertion.  Reply 7.  Petitioner argues for the first time on Reply that Dworkin discloses multiple generic computational units (rather than the claimed arithmetic units), with each unit sending its output back to the controller.  *Id.*

We are not persuaded by Petitioner.  The contention presented by Petitioner in the Petition, as quoted above, was that Dworkin fed the output of an addition unit, a multiplication unit, and a sign inversion unit directly to a controller.  Pet. 30.  Neither the Petition nor the Koç Declaration argues that Matsuzaki could be modified by feeding the outputs of its three arithmetic units back to the controller by applying a teaching of Dworkin to

16

IPR2014-00180
Patent 7,634,666 B2

feed the outputs of multiple generic computational units directly to a controller. *See* Pet. 30–31; Ex. 1001 ¶¶ 117–18. Nor does the Petition explain how, or why, this modification of Matsuzaki would be accomplished. *Id.* Accordingly, we are not persuaded that the Petition presents sufficient evidence to support this late presented contention of obviousness.

At the hearing, Petitioner argued that its Reply arguments and evidence were not presented in detail because Dr. Koç believed that this was a trivial aspect of Dworkin that did not need to be explained. Tr. 11:15–24. Petitioner argues that it was only necessary to present this evidence after Patent Owner's expert demonstrated "confusion" and "misunderstanding" as to what Dworkin teaches. *Id.* at 12:1–22. Nevertheless, Petitioner's argument and evidence in the Reply also does not show that Dworkin teaches the claimed feedback. Patent Owner has presented persuasive evidence that Dworkin does not feedback the outputs of multiple computational units to a controller. Petitioner's Reply evidence and argument does not rebut adequately Patent Owner's position.

According to Patent Owner, if any sub-ALU 18 feeds information back to controller 20, it is only the left-most sub-ALU. PO Resp. 15–18. Patent Owner supports its arguments with the declaration testimony of Dr. Patrick Schaumont, Ph.D. (Ex. 2001, "Schaumont Decl.").

Patent Owner contends that Figure 6 of Dworkin illustrates in more detail the sub-ALUs shown in Figure 2 configured to perform finite field multiplication. PO Resp. 15 (citing Ex. 2001 ¶ 58). Figure 6 is reproduced below:

IPR2014-00180
Patent 7,634,666 B2



*FIG. 6*

Figure 6 is circuit diagram of a finite-field multiplier. Ex. 1012, 2:21–22. According to Patent Owner, each block 70 of Figure 6 corresponds to the logic performed by a sub-ALU 18 of Figure 2. PO Resp. 15; Ex. 2001 (Schaumont Decl.) ¶ 60). For example, the left-most block 70 (*i*) of Figure 6 corresponds to the left-most sub-ALU 18 of Figure 2. *Id.* Patent Owner further argues that the inputs (e.g., $a_j$, $b_m$, etc.) to the logic of each block come from corresponding cells of the special purpose registers 16 shown in Figure 2 and shown in more detail in Figure 5. PO Resp. 16; Ex. 2001 ¶ 62. We agree with these arguments regarding the correspondence of Figures 2, 5, and 6. Each box 70 in Figure 6 is referred to as "a detailed circuit implementation of the bit-slice 41 of FIG. 5 for finite field multiplication." Ex. 1012, 5:11–13. According to Dworkin, "[a] sub ALU 18 shown in

18

IPR2014-00180
Patent 7,634,666 B2

FIG. 2 may be implemented by the circuitry of block 52 of FIG. 5," which is included in bit-slice 41. *Id.* at 4:8–10.

Regarding the operation of the logic shown in Figure 6, Patent Owner contends that $b_m$ and $c_m$ are control bits, but are not described as feedback from any sub-ALU. PO Resp. 17; Ex. 2001 ¶¶ 64–65. Patent Owner argues that the output $c_{j-2}$ of box 70(i-2) is fed as an input to box 70(i-1) and the output $c_{j-1}$ of box 70 (i-1) is fed as an input to box 70. PO Resp. 16–17; Ex. 2001 ¶ 62. According to Patent Owner, only the output $c_j$ of box 70(i) is returned on output data bus 30 (Figure 2) to the left-most cell of the C register. PO Resp. 17; Ex. 2001 ¶ 63. Because only the left-most cells of registers 26 of Figure 2 are feedback to controller 20, Patent Owner argues, the output of only the left-most sub-ALU of Figure 2 is feedback to the controller. PO Resp. 17–18; Ex. 2001 ¶¶ 63, 89. Patent Owner's arguments and evidence are persuasive as they are consistent with what is depicted clearly in Figure 6.

Petitioner, in its Reply, disagrees with Patent Owner's characterization of Dworkin. Petitioner relies on the Koç Reply Declaration to explain its competing theory of Dworkin's operation.

Petitioner's theory relies on pseudo-code reproduced in Dworkin (Ex. 1012, 4:20–28), which Dworkin characterizes as a series of steps implementing finite-field multiplication (*id.* at 4:16–19). Reply 7–9. According to Petitioner, Dworkin calculates a first partial product, with the first bit corresponding to the output of the left-most sub-ALU 18 of Figure 2, stores it in register C, and shifts the entire first partial product (all of register C) to the left; calculates a second partial product, with its second bit corresponding to the output of the next sub-ALU 18 to the right, stores it in

19

IPR2014-00180
Patent 7,634,666 B2

register C, and shifts the entire second partial product to the left; and repeats this process with subsequent partial products and sub-ALUs, with the output of each sub-ALU eventually reaching the controller. *Id.* (citing Ex. 1029 ¶¶ 30–40). Dr. Koç's Reply Declaration largely repeats the arguments in the Reply, adding annotated drawings from Dworkin, but otherwise adding no additional evidence. Ex. 1029 ¶¶ 30–40.

Petitioner, however, does not point to evidence sufficient to explain how shifting the partial products to the left results in sub-ALU's to the right of the left-most sub-ALU feeding their outputs back to the controller. Petitioner relies on the pseudo-code reproduced in Dworkin. This pseudo-code describes, at a high level, the general algorithm used in Dworkin's implementation of finite field multiplication. Figures 5 and 6, on which Patent Owner relies, depict in detail the structure used to implement the pseudo-code's algorithm. Ex. 1012, 3:49–5:29. Patent Owner has introduced persuasive evidence and testimony, based on these figures and the corresponding description, showing that the output of each sub-ALU 18 other than the left-most sub-ALU 18 is fed as an input to the next sub-ALU to the left rather than fed back to the controller. We credit this evidence.

Petitioner does not rebut persuasively Patent Owner's evidence or point to sufficient evidence that supports the contention that each of these sub-ALU outputs (other than the left-most) is nevertheless shifted to the controller. Indeed, upon being asked to testify on cross examination regarding Figures 5 and 6, Dr. Koç stated that his Reply Declaration did not address those figures or their inner workings and that he would need time to prepare in order to testify about them. Ex. 2016, 36:25–37:24. Petitioner and its Declarant failed to provide a detailed analysis of Dworkin in the

20

IPR2014-00180
Patent 7,634,666 B2

Petition and further have failed to address, in the Reply, Patent Owner's
rebuttal evidence, which we find very persuasive.

In short, Petitioner has not shown that Dworkin teaches feeding back
the output of multiple separate computational units to a controller.
Accordingly, Petitioner has not shown that Matsuzaki and Dworkin teach
"the outputs of the multiplication unit, the addition unit and the sign
inversion unit are feedback to the arithmetic controller," as recited in
claim 1. For the same reasons, Petitioner has not shown that Matsuzaki and
Dworkin teach "wherein the outputs of the multiplication unit, an addition
unit and a sign inversion unit are feedback to the arithmetic controller," as
recited in independent claim 4. Claims 2, 3, and 8 depend from claim 1 and
claims 5–7 and 9–11 depend from claim 4. Because Petitioner has not
shown that Matsuzaki and Dworkin teach each limitation of any of claims 1–
11, Petitioner has not met its burden of proving, by a preponderance of the
evidence, that any of claims 1–11 would have been obvious.

### 4. *Petitioner has not shown a Reason to Combine Matsuzaki and Dworkin*

Regarding claim 1, Petitioner contends that both Matsuzaki and
Dworkin address hardware implementations of cryptographic co-processors,
teach Montgomery reduction, and have similar methods and internal control
methodologies. Pet. 31. Accordingly, Petitioner argues, "one having
ordinary skill in the art would combine the 'outputs' (plural) of Dworkin
with the disclosure of Matsuzaki." *Id*. 31 (citing Ex. 1001 (Koç Decl.)
¶¶ 144–49). Petitioner's reason for combining Matsuzaki and Dworkin for
claim 1 is substantially the same. Pet. 44 (citing Ex. 1001 ¶¶ 144–49). The

IPR2014-00180
Patent 7,634,666 B2

parties dispute whether Petitioner has provided a sufficient reason why a skilled artisan would have combined Matsuzaki and Dworkin.

According to the Supreme Court, the conclusion of obviousness based on a combination of references must be supported with explicit analysis of a reason to combine those references:

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. To facilitate review, this analysis should be made explicit.

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The Federal Circuit has stated that such reasons must be more than "mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006); *accord Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 (Fed. Cir. 2008) (agreeing with the district court's reasoning that "some kind of motivation must be shown from some source, so that the jury can understand why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented method"). "[W]hether there is a reason to combine prior art references is a question of fact." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1367 (Fed. Cir. 2012). To that end, we look to the evidence presented by Petitioner to determine if it supports an articulable reason to combine.

22

IPR2014-00180
Patent 7,634,666 B2

In the Petition, Petitioner contends that Matsuzaki and Dworkin both describe cryptographic co-processors that perform Montgomery reduction using similar methods and internal controls.  Pet. 31; Ex. 1001 ¶¶ 145–48.  Patent Owner characterizes Petitioner's argument as merely pointing out similarities between the references and argues that this is not sufficient to show a reason to combine because it does not explain *why* a skilled artisan would have combined them.  PO Resp. 36–37.  At the hearing, Petitioner contended that a skilled artisan would have combined the references to "ha[ve] granular control on how computations are performed," Tr. 19:7–8, and "to be able to have this optimal hardware with multiple components," *id.* at 19:15–16.  Petitioner also argued that a skilled artisan would have combined the references "in order to create a processor that performs both ECC and RSA efficiently and quickly."  Tr. 21:7–10.  Petitioner contended that it presented these arguments in its Petition, at page 31, and in Dr. Koç's Declaration, at ¶¶ 145 and 148.  *Id.* at 19:17–22; 21:12–16.

In the Petition Petitioner's stated reason to combine Matsuzaki and Dworkin to arrive at claim 1 is limited to:

> Both Matsuzaki and Dworkin address hardware implementations of fast cryptographic co-processors. (Ex. 1001, Koc Decl., ¶ 145.)  Matsuzaki and Dworkin also teach Montgomery reduction, similar methods of processing cryptographic data, and internal control methodology. (Ex. 1001, Koc Decl., ¶¶ 146–48.)  Therefore, one having ordinary skill in the art would combine the "outputs" (plural) of Dworkin with the disclosure of Matsuzaki.

Pet. 31.  Thus, contrary to Petitioner's argument at the hearing, the only reason to combine stated in the Petition itself is the purported similarities between the references.

23

IPR2014-00180
Patent 7,634,666 B2

The reasons to combined given by Dr. Koç in his Declaration (Ex. 1001 ¶¶ 145–148)[1] also are limited to the purported similarities of the references.

In Paragraph 145, Dr. Koç testifies that Matsuzaki and Dworkin both address the same problem, namely "optimal hardware implementation of a cryptographic co-processor with multiple components." Ex. 1001 ¶ 145. According to Dr. Koç, both Matsuzaki and Dworkin describe specific components that could be used in both ECC and RSA encryption.[2] *Id.* The import of this testimony is that Matsuzaki and Dworkin address the same problem using similar technology. Dr. Koç does not explain why a skilled artisan would have incorporated features from Dworkin (i.e., its form of feedback) into Matsuzaki's solution.

In Paragraph 146 of Exhibit 1001, Dr. Koç testifies that both Matsuzaki and Dworkin teach hardware implementations of Montgomery

---

[1] Petitioner's incorporation of argument from the Koç Declaration is arguably contrary to 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document."). Nevertheless, we exercise our discretion and consider them. In any case, the arguments in the Koç Declaration add very little to the reason stated in the body of the Petition, as explained below.

[2] Patent Owner and Petitioner dispute whether Matsuzaki teaches toward or away from performing RSA encryption. PO Resp. 43–46; Reply 5–6. We do not reach this issue because, even if we assume Matsuzaki teaches performing RSA encryption, Petitioner has not explained why that teaching is evidence of a reason to combine Matsuzaki and Dworkin.

IPR2014-00180
Patent 7,634,666 B2

reduction[3] and that "the common disclosure of Montgomery reduction in Matsuzaki and Dworkin would lead one having ordinary skill in the art to consider their teachings together." Here, Dr. Koç testifies that the prior art references have similar hardware implementations, but we are not persuaded that this testimony explains why the references would have been combined.

In Paragraph 147 of Exhibit 1001, Dr. Koç testifies that Matsuzaki and Dworkin teach similar methods of processing cryptographic data. In Paragraph 148, Dr. Koç testifies that Matsuzaki and Dworkin teach similar ways of controlling the computations that are performed by their respective arithmetic units. This testimony also focuses on the similarity of the references, and does not address why the references would have been combined.

In Paragraph 149 of Exhibit 1001, Dr. Koç concludes, "based upon all of these specific similarities, as well as common sense," that a skilled artisan would have combined Matsuzaki and Dworkin. Petitioner reiterates, in its Reply, that it is relying solely on the purported similarities of the references to show a reason to combine: "These similarities would have motivated a PHOSITA to combine 'the 'outputs' (plural) of Dworkin with the disclosure of Matsuzaki.'" Reply 3. Not only is the Petition silent as to "granular control," "optimal hardware," and "efficiency," Petitioner has introduced no factual support for these arguments.

_____

[3] The parties dispute whether Dworkin teaches Montgomery reduction. PO Resp. 47; Reply 5. We do not reach this issue because, even if we assume Dworkin teaches Montgomery reduction, Petitioner has not explained why that evidences a reason to combine Matsuzaki and Dworkin.

IPR2014-00180
Patent 7,634,666 B2

To be sure, "the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239 (Fed. Cir. 2010). We conclude, however, that merely pointing out similarities between Matsuzaki and Dworkin and invoking the words "common sense" (Ex. 1001 ¶ 149) is not a sufficient articulation of a reason to combine. *Cf. Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1330 (Fed. Cir. 2009) ("We reiterate that, on summary judgment, to invoke 'common sense' or any other basis for extrapolating from prior art to a conclusion of obviousness, a district court must articulate its reasoning with sufficient clarity for review."). In any case, the technology at issue here is not "easily understandable"; rather, it is sufficiently complex such that expert testimony is particularly helpful to our resolution of the factual dispute regarding the purported reasons to combine the references. *Wyers*, 616 F.3d at 1240 & n.5 (citing *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1369 (Fed. Cir. 2004)). Thus, the lack of expert testimony supporting a sufficient reason to combine Matsuzaki and Dworkin weighs heavily against Petitioner.

At the hearing, Petitioner further contended that Dr. Koç presented additional reasons to combine in his Reply Declaration. Tr. 25:7–10 (citing Ex. 1029 ¶¶ 6–25). These paragraphs address whether Dworkin describes Montgomery reduction (Ex. 1029 ¶¶ 7–13); present additional arguments regarding the similarity of Matsuzaki and Dworkin (*id.* ¶¶ 14–22); and contend that Matsuzaki teaches RSA encryption (*id.* at 23–25). We see no testimony, however, regarding reasons to combine the references. In sum, Petitioner has introduced no factual support for a reason to combine other than the purported similarity of Matsuzaki and Dworkin.

26

IPR2014-00180
Patent 7,634,666 B2

We now address whether Petitioner's evidence of similarity is sufficient to show a reason to combine. Patent Owner, citing *InTouch Technologies, Inc. v. VGO Communications, Inc.*, 751 F.3d 1327 (Fed. Cir. 2014), argues that evidence of similarity is not sufficient, by itself, to show a reason to combine Matsuzaki and Dworkin. PO Resp. 39–40. The *InTouch* court discounted an expert's testimony that "primarily consisted of conclusory references to her belief that one of ordinary skill in the art *could* combine these references, not that they *would* have been motivated to do so." 751 F.3d at 1352. We agree that Petitioner's evidence suffers from the same deficiency. By arguing that Matsuzaki and Dworkin are similar, Petitioner essentially argues that a skilled artisan could have combined them. But that leaves open the question whether a skilled artisan would have had a reason or motivation to do so.

At the hearing, Petitioner contended that multiple similarities between two references is a sufficient reason to combine, arguing that

> according to *KSR*, . . . a court can look to interrelated teachings of multiple references, the effects of the demands known to the design community or present in the marketplace, and the background knowledge possessed by persons having ordinary skill in the art, all to determine whether there is a reason to combine the references.

Tr. 20:11–18. Here, Petitioner paraphrases the quote from *KSR* reproduced above. Importantly, that quote continues: "To facilitate review, this analysis should be made explicit." *KSR*, 550 U.S. at 418. Petitioner does not explain, or present evidence to show, how the purported interrelated teachings of Matsuzaki and Dworkin, along with any demand and background knowledge, would have led a skilled artisan to combine

27

IPR2014-00180
Patent 7,634,666 B2

Matsuzaki and Dworkin.  Although evidence of interrelated teachings is one factor to consider, *KSR* identifies many other factors that can be considered "*all* in order to determine" whether there is a reason to combine the references—hence, evidence bearing on one factor alone may be insufficient to carry Petitioner's evidentiary burden.  Here, Petitioner has failed to present explicitly a cogent reason why the similarities of the references alone evidence sufficient reason to combine.

As Patent Owner argues, *KSR* provides several possible reasons why a skilled artisan might combine references, including combining known elements to yield predictable results, simply substituting one element for another element that is known to be interchangeable, and using a known technique from one field to improve devices in another field in a predictable way.  PO Resp. 32 (citing *KSR*, 550 U.S. at 415–18).  Petitioner does not introduce evidence that a combination of Matsuzaki would have been predictable.  Nor does Petitioner contend that Dworkin's technique would have been a simple substitution for Matsuzaki's.  Rather, Petitioner argued, when pressed at the hearing for a more precise statement of how the references would have been combined, that a skilled artisan "would take the multiple feedbacks of the outputs of the computational units of Dworkin and add those to the returning back of the carry-up signal of the Matsuzaki reference."  Tr. 17:21–18:2.  Petitioner, however, offers no evidence that Dworkin's feedback is advantageous or that adding this feedback to Matsuzaki would have improved Matsuzaki in a similar or predictable way.  Such evidence is not implied merely by the similarity of the references.

After the hearing, Petitioner brought to our attention *Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, 774 F.3d 968 (Fed. Cir. 2014).

IPR2014-00180
Patent 7,634,666 B2

Ex. 1042, 9:15–10:9.  *Tyco* does not support Petitioner's arguments.  In *Tyco*, the Federal Circuit concluded that it would have been obvious to substitute a curved blade feature of a surgical device disclosed in a first prior art reference for the straight blade disclosed in a second reference in order to employ the benefits disclosed in the first reference.  774 F.3d at 977–78.  Addressing another set of claims, the *Tyco* court concluded that it would have been obvious to substitute a dual cam structure disclosed in a first prior art reference for a single cam structure disclosed in another, even though the two references were from different fields of endeavor, because the first reference explicitly disclosed that a wide variety of surgical devices could benefit from the feature.  774 F.3d at 978–79.  In both instances, the Federal Circuit relied on explicit disclosure in the art of the benefits of the feature to be added and applied the principle articulated in *KSR* that "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."  *KSR*, 550 U.S. at 417.  As explained above, Petitioner has not introduced evidence sufficient to show that Dworkin's feedback technique provides an improvement that would be similarly applicable to the system disclosed in Matsuzaki.

In sum, we have evaluated the evidence introduced by Petitioner, including the Koç Declaration and the Koç Reply Declaration, and find that Petitioner has not shown sufficiently a reason, with rational underpinning, to combine Matsuzaki and Dworkin.  Evidence that Matsuzaki and Dworkin have similarities and argument that the combination is mere "common sense" are not enough.  Accordingly, we conclude that Petitioner has not met

29

IPR2014-00180
Patent 7,634,666 B2

its burden of showing, by a preponderance of the evidence, that any of claims 1–11 would have been obvious over Matsuzaki and Dworkin.

III.     CONCLUSION

For the reasons given, we are not persuaded that Petitioner has shown by a preponderance of the evidence that claims 1–11 of the '666 patent are unpatentable based on the challenges on which trial was instituted.

IV.     ORDER

For the reasons given, it is

ORDERED that claims 1–11 of U.S. Patent No. 7,634,666 B2 have not been shown by a preponderance of the evidence to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is denied;

FURTHER ORDERED that Patent Owner's Motion to Exclude is denied; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-00180
Patent 7,634,666 B2


PETITIONER:
Kenneth R. Adamo
Eugene Goryunov
KIRKLAND & ELLIS LLP
kenneth.adamo@kirkland.com
eugene.goryunov@kirkland.com



PATENT OWNER:

Herbert D. Hart III
Jonathan R. Sick
Peter J. McAndrews
MCANDREWS, HELD & MALLOY, LTD.
hhart@mcandrews-ip.com
jsick@mcandrews-ip.com
pmcandrews@mcandrews-ip.com

31



US007634666B2

(12) **United States Patent**
Cheng et al.

(10) **Patent No.:** **US 7,634,666 B2**
(45) **Date of Patent:** **Dec. 15, 2009**

(54) **CRYPTO-ENGINE FOR CRYPTOGRAPHIC PROCESSING OF DATA**

(75) Inventors: **Lee Ming Cheng**, Hong Kong (HK); **Ting On Ngan**, Hong Kong (HK); **Ka Wai Hau**, Hong Kong (HK)

(73) Assignee: **Cityu Research Limited**, Kowloon, Hong Kong (HK)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 509 days.

(21) Appl. No.: **10/641,869**

(22) Filed: **Aug. 15, 2003**

(65) **Prior Publication Data**
US 2005/0036617 A1      Feb. 17, 2005

(51) **Int. Cl.**
*G06F 17/10* (2006.01)

(52) **U.S. Cl.** ...................... 713/191; 713/189; 713/192; 380/30

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,316,055 A      2/1982 Feistel

| | | | |
|---|---|---|---|
| 4,484,301 A * | 11/1984 | Borgerding et al. | 708/632 |
| 4,891,781 A * | 1/1990 | Omura | 708/670 |
| 6,230,179 B1 * | 5/2001 | Dworkin et al. | 708/492 |
| 6,397,241 B1 * | 5/2002 | Glaser et al. | 708/625 |
| 6,671,709 B2 * | 12/2003 | Glaser et al. | 708/492 |
| 7,027,597 B1 * | 4/2006 | Stojancic et al. | 380/28 |
| 7,277,540 B1 * | 10/2007 | Shiba et al. | 380/28 |

FOREIGN PATENT DOCUMENTS

WO      WO 00/46954      8/2000

OTHER PUBLICATIONS

Pseudorandom Generator Based on Clipped Hopfield Neural Network; IEEE 1998; Cheng Et Al.

* cited by examiner

*Primary Examiner*—Jung Kim
(74) *Attorney, Agent, or Firm*—Alix, Yale & Ristas, LLP

(57) **ABSTRACT**

A crypto-engine for cryptographic processing has an arithmetic unit and an interface controller for managing communications between the arithmetic unit and a host processor. The arithmetic unit has a memory unit for storing and loading data and arithmetic units for performing arithmetic operations on the data. The memory and arithmetic units are controlled by an arithmetic controller.

**11 Claims, 8 Drawing Sheets**



IBM Ex. 1005



**FIGURE 1**



**FIGURE 2**



FIGURE 3

004

- A047 -



a
b1
b2
n1
n2
mux_select[1]
MUX 1
mux_select[2]
MUX 2
mux_select[3]
MUX 3
mux_select[4]
MUX 4
mux_select[5]
MUX 5
25
data_out0
data_out1
data_out2
data_out3
data_out4
24
16 x k bit SRAM 0
8 x k bit SRAM 1
8 x k bit SRAM 2
8 x k bit SRAM 3
8 x k bit SRAM 4
address_select[0:3]
data_in0
control_select[0:1]
address_select[4:6]
data_in1
control_select[2:3]
address_select[7:9]
data_in2
control_select[4:5]
address_select[10:12]
data_in3
control_select[6:7]
address_select[13:15]
data_in4
control_select[8:9]
mux_select[0]
MUX 0
23
address_select[0:15]
control_select[0:9]
mux_select[0:5]
16
10
6
Address Decoder
22
13
data_in
temp_data
address
control1
4
k

FIGURE 4

005



FIGURE 5



FIGURE 6



**FIGURE 7**

008



**FIGURE 8**

US 7,634,666 B2

**1**

## CRYPTO-ENGINE FOR CRYPTOGRAPHIC PROCESSING OF DATA

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to crypto-engines for cryptographic processing of data. More particularly, the invention relates to a crypto-engine capable of executing either Rivest-Shamir-Adleman (RSA) or Elliptic Curve Cryptography (ECC) public key encryption protocols.

2. Description of Prior Art

The RSA public-key cryptosystem devised by Rivest, Shamir and Adleman and the EEC cryptosystem devised by Koblitz and Miller are two common algorithms adopted by public key infrastructures.

RSA involves a computation of the exponentiation and modulo of product of two large prime numbers whereas ECC is based on computations with points on an elliptic curve. To achieve faster speed, hardware architectures are normally used to implement these algorithms.

In RSA, the main basic operation is the modular multiplication. When the ECC is implemented over the field GF(p), where p is a large prime number, the main basic operations are also modular multiplication. Thus the two algorithms share a common operation. However, in known hardware architectures resources cannot be shared by the algorithms and reused.

### SUMMARY OF THE INVENTION

It is an object of the present invention to provide a hardware based crypto-engine for asymmetric cryptographic processing using RCA or ECC algorithms. It is a further object of the invention to provide a crypto-engine that operates as a coprocessor to a host processor.

According to the invention there is provided a crypto-engine for cryptographic processing of data comprising an arithmetic unit operable as a co-processor for a host processor and an interface controller for managing communications between the arithmetic unit and host processor, the arithmetic unit including:

a memory unit for storing and loading data,

a multiplication unit, an addition unit and a sign inversion unit for performing arithmetic operations on said data, and

an arithmetic controller for controlling the storing and loading of data by the memory unit and for enabling the multiplication, addition and sign inversion units.

Preferably, the memory unit comprises:

an input switch for selecting input/interim data, a plurality of Static Random Access Memory elements for receiving and storing the input/interim data from the input switch,

a plurality of output switches connected to the memory elements, and

an address controller for controlling flow of the data through the switches and memory elements.

Preferably, the multiplication unit comprises:

a register to pre-store the multiplier data,

a pair of multiplication elements for performing multiplication,

a shift register to load the multiplier data bitwise into the multiplication elements, and

a first-in-first-out register for synchronizing data movement between the multiplication elements.

**2**

Preferably, the multiplication elements comprise a bitwise segmented multiplier, a bitwise segmented multiplicand, and a modulo for performing modular multiplication of the multiplier and multiplicand according to the modulo value.

Preferably, the interface controller comprises

a bus interface for connecting high frequency manipulated data inside the arithmetic unit with the lower frequency manipulated data in the host processor,

a concatenater/splitter for merging or splitting data width, and

a cryptographic controller for generating status and interrupt signals for the host processor and having a op-code generator for generating the op-code signals for the arithmetic unit to select RSA or ECC operations and to synchronize the timing discrepancy of heterogeneous processing.

Further aspects of the invention will become apparent from the following description, which is given by way of example only.

### BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention will now be described by way of example only and with reference to the accompanying drawings in which:

FIG. **1** is a block diagram of a compact crypto-engine for asymmetric cryptographic processing according to the invention,

FIG. **2** is a block diagram of a modular arithmetic unit,

FIG. **3** is a block diagram of an interface control unit,

FIG. **4** is a block diagram of Static Random Access Memory (SRAM) Block,

FIG. **5** is a block diagram of a modular multiplication unit,

FIG. **6** is a block diagram of a processor element,

FIG. **7** is a flow diagram of RSA implementation example using polling mode, and

FIG. **8** is a flow diagram of an RSA implementation example using interrupt mode.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the invention a common architecture platform for the two algorithms, RSA and ECC, whose inputs are taken in two different forms, is used to manipulate the two asymmetric encryption algorithms. In the preferred embodiment the combining function is restricted to the computational engine, i.e. modular manipulation. This relies heavily on the low-bit, say 8 bit, processor software to complete the design. Thus, three design considerations must be taken into account. These are:

1) hardware optimization for both RSA and ECC implementation with the best speed/resource trade off,

2) the amount of design/module reuse and hardware sharing of the two protocols, and

3) the asynchronous executing of the hardware modules in much higher speed than the processor communicating with it, i.e. heterogeneous processing.

The preferred embodiment of the present invention provides a compact crypto-engine capable of executing asymmetric cryptographic algorithms including both RSA and ECC protocols and has heterogeneous computation ability running at a higher internal clock speed.

Referring to FIG. **1**, the preferred embodiment of a compact crypto-engine **10** comprises a Modular Arithmetic Unit (MAU) **11** and an Interface Control Unit (ICU) **12**. The inputs and outputs of the ICU are provided from/to a host processor

US 7,634,666 B2

**3**

(not shown) such as a personal, network computer or Digital Signal Processor. The host processor provides an 8-bit 'data' transput (input and output) to and from ICU **12**, and 8-bit 'key' and operation code ('opcode') inputs to ICU **12**. The ICU **12** has an 8-bit 'status' and a 1-bit 'interrupt' output to signal the host processor. Communication between the ICU **12** and MAU **11** comprises a k-bit 'data_in' and a 8-bit 'modular_opcode' signals from the ICU **12** to the MAU **11**, and a k-bit 'data_out' and a 8-bit 'status_out' signals from the MAU **11** to the ICU **12**.

Referring to FIG. **2**, the MAU **11** comprises an SRAM Block **13**, a Controller **14**, a Modular Multiplication Unit (MMU) **15**, a Modular Addition Unit (MADU) **16** and a Sign Inversion Unit (SIU) **17**. The outputs k-bit 'data_in' of ICU **12**, k-bit 'temp_data' of MMU **15**/MADU **16**/SIU **17**, 4-bit 'address' and 4-bit 'control1' of Controller **14** go into SRAM Block **13**. The output k-bit 'a/b1/b2/n1/n2' of SRAM Block **13** goes to MMU **15**. The output 'a/b1/n1' of SRAM Block **13** goes to MADU **16**. The output k-bit 'b1' of SRAM Block **13** goes to SIU **17**.

The outputs 8-bit 'modular_opcode' of ICU **12** and k-bit 'temp_data' of MMU **15**/MADU **16**/SIU **17** go to Controller **14**. The outputs 4-bit 'address/control1' of Controller **14** goes to SRAM Block **13**. The output 6-bit 'control2' goes to MMU **15**. The output 3-bit 'control3' of Controller **14** goes to MADU **16**. The output 3-bit 'control4' of Controller **14** goes to SIU **17**. The 8-bit 'status_out' of Controller **14** goes to ICU **12**. The output k-bit 'a/b1/b2/n1/n2' of SRAM Block **13** and 6-bit 'control2' of Controller **14** go to MMU **15**. The output k-bit 'data_out' of MMU **15** goes to ICU **12** and the output k-bit 'temp_data' of MMU **15** goes to SRAM Block **13** and Controller **14**.

The outputs k-bit 'a/b1/n1' of SRAM Block **13** and 3-bit 'control3' of Controller **14** go to MADU **16**. The output k-bit 'temp_data' of MADU **16** goes to SRAM Block **13** and Controller **14**. The outputs k-bit 'b1' of SRAM Block **13** and 3-bit 'control4' of Controller **14** go to SIU **17**. The output k-bit 'temp_data' of SIU **17** goes to SRAM Block **13** and Controller **14**.

Referring to FIG. **3**, the Interface Control Unit **11** comprises a Bus Interface Unit (BIU) **18**, a Concatenation/Split Unit (CSU) **19** and a Modular-opcode Generator (MOG) **20** embedded into a Cryptographic Controller (CrC) **21**. The 8-bit transput (input and output) 'data' of buffer BDATA in BIU **18** is provided to the host processor. The 8-bit outputs 'opcode' and 'key' from the host processor are provided to the buffer BOPCODE and BKEY respectively in the BIU **18**. The 8-bit output 'status' and 1-bit output 'interrupt' of BSTATUS and BINTERRUPT in BIU **18** respectively are provided to the host processor. In the preferred embodiment, the ICU provides buffers to handle heterogeneous operation and the 'interrupt' signal to synchronize the data exchange. This allows the crypto-engine **10** to operate at a different clock speed to the host processor.

The 8-bit transput 'Tdata' of Buffer BDATA in BIU **18** is provided to the Concatenation/Split Unit **19**. The 8-bit outputs 'Topc' and 'Tkey' of buffer BOPCODE and BKEY respectively in the BIU **18** are provided to the Modular-opcode Generator (MOG) **20** inside Cryptographic Controller (CrC) **21**. The outputs 8-bit 'Tsta' and 1-bit 'Tint' generated from the 'status_out' signal in the CrC **21** are provided to the BIU **18**. The k-bit output 'data_in' of Concatenation/Split Unit (CSU) **19**, generated by cascading a sequence of 8-bit 'Tdata', is provided to MAU **11**. The k-bit output 'data_out' of MAU **11**, converted to a sequence of 8-bit 'Tdata', is provided to Concatenation/Split Unit (CSU) **19**. The 8-bit output 'module_opcode' of MOG **20**, generated from signals

**4**

'Topc' and 'Tkey', is provided to MAU **11**. The 8-bit output 'status_out' of MAU **11** is provided to CrC **21** to generate the 8-bit 'Tsta' and 1-bit 'Tint' signals.

Referring to FIG. **4**, the Static Random Access Memory (SRAM) block **13** comprises an Address Decoder **22**, a plurality of switches MUX0 **23** and MUX1/MUX2/MUX3/MUX4/MUX5 **25**, a plurality of memory blocks **24** comprising one 16×k-bit SRAM0 and four 8×k-bit SRAM1/SRAM2/SRAM3/SRAM4/SRAM5. In the preferred embodiment there are a total of $3 \times 10^{24}$-bit SRAM blocks to store the 5 parameters 'a/b1/n1/b2/n2' for 1024-bit RSA modular multiplication in various stages or to store 192-bit ECC temporary data. The gate counts required for storing of interim manipulation results are substantially reduced.

To ameliorate the overflow problems that may be encountered during the modular multiplication calculation in MMU **15**, a memory-size-expansion approach is adopted with according to the memory block size provided by Integrated Circuit fabrication supplier, say a 1152-bit memory for a 1024-bit manipulation.

Another preferred approach to overcome the overflow problem is to provide an "overflow control unit" with additional one bit for checking, say 1025-bit memory for 1024-bit manipulation.

Still referring to FIG. **4**, the 4-bit outputs 'address' and 'control1' of Controller **14** are provided to Address Decoder **22** to generate one 16-bit 'address_select[0:15'] output, one 10-bit 'control_select[0:9]' output and one 6-bit 'mux_select [0:5]' output. The output first bit 'mux_select[0]' of Address Decoder **22** is provided to switch MUX0 **23** to select either k-bit 'data_in' outputted by ICU **12** or k-bit 'temp_data' outputted by MMU **15**/MAU **16**/SIU **17**. The outputs k-bit 'data_in 0', 'data_in1', 'data_in2', 'data_in3', and 'data_in4' of MUX0 **23** are provided to SRAM0, SRAM1, SRAM2, SRAM3 and SRAM4 **24** respectively.

The output 3-bit address_select[0:3], address_select[4:6], address_select [7:9], address_select [10:12] and address_select[13:15] of Address Decoder **22** is provided to SRAM0, SRAM1, SRAM2, SRAM3 and SRAM4 **24** respectively. The output 2-bit control_select[0:1], control_select[2:3], control_select [4:5], control_select [6:7] and control_select[8:9] of Address Decoder **22** are provided to SRAM0, SRAM1, SRAM2, SRAM3 and SRAM4 **24** respectively.

SRAM0, SRAM1, SRAM2, SRAM3 and SRAM4 receive respective signals 'address_select[0:15]', 'data_in 0'/'data_in1'/'data_in2'/'data_in3'/'data_in4 and 'control_select[0:9]' to generate respective k-bit outputs 'data_out0', 'data_out1', 'data_out2', 'data_out3' and 'data_out4'.

The 1-bit outputs 'mux_select[1]', 'mux_select[2]', 'mux_ select[3]', 'mux_select[4]'and 'mux_select[5]' of Address Decoder **22** control switches **25** to select between MUX1 inputs 'data_out0' or 'b1', MUX2 and MUX3 inputs 'data_out1' or 'data_out2' and MUX4 and MUX5 inputs 'data_out3' or 'data_out4'.

Referring to FIG. **2**, the k-bit outputs 'a', 'b1', 'b2', 'n1' and 'n2' of switches **25** are provided to MMU **15**; outputs 'a', 'b1' and 'n1' are provided to MAU **16**; and output 'b1' is provided to SIU **17**.

Referring to FIG. **5**, the Modular Multiplication Unit MMU **15** comprises a pair of Process Elements PE1 **26** and PE2 link up with a Flop-flip (FF), a Register **27**, a Shift Register **28**, a First in First Out Flip-flop (FIFO) **29** and a Control Line Element (CLE) **30**. The 6-bit output 'control2' of Controller **14** is provided to Control Line Element **30** and

**011**

US 7,634,666 B2

**5**

is decoded into a plurality of outputs 'load_control', 'load_shift_control', 'load_a_control1' (PE**1**) and 'load_a_control2' (PE**1**).

The k-bit output 'a' of SRAM Block **13** is provided to Register **27**. The k-bit output 'data_out' of Register **27** is provided to Shift Register **28** and to ICU **12** when the output 'load_control' of CLE **30** is set.

The 1-bit outputs 'a$_i$' and 'a$_{i+1}$' of Shift Register **28** are provided to Process Element **1** (PE**1**) **26** and Process Element **2** (PE**1**) respectively when the output 'load_shift_control' of CLE **30** is set.

In the preferred embodiment the interim data 'U_out' and 'u_carry_out' are included with (k+1)-bit instead of normal (2×k)-bit for logic gate size (physical hardware size) reduction and the FIFO **29** is used as a delay line for the inputs k-bit 'u_out' and 1-bit 'u_carry' of PE**1**. The k-bit output 'U_in' of FIFO **29** is provided to a Flip-flop (FF**1**) and the k-bit output 'temp_data' of FF**1** is provided to SRAM Block **13**.

The k-bit outputs 'b1' and 'n1' of SRAM Block **13**, the outputs k-bit 'U_in' and 1-bit 'u_carry' of FIFO **29**, the output 'a$_i$' of Shift Register **28** and the outputs 1-bit 'load_a_control1' (PE**1**) of CLE **30** are provided to Process Element **1** (PE**1**) to generate the outputs k-bit 'u_out0' and 1-bit 'u_carry0'. The outputs k-bit 'u_out0' and 1-bit 'u_carry0' are provided to Flip-flop (FF**2**) to generate the outputs k-bit 'u_out1' and 1-bit 'u_carry1'.

The k-bit outputs 'b2' and 'n2' of SRAM Block **13**, the outputs k-bit 'U_out1' and 1-bit 'u_carry1' of Flip-flop (FF**2**), the output 'a$_{i+1}$' of Shift Register **28** and the outputs 1-bit 'load_a_control2' of CLE **30** are provided to Process Element **2** (PE**1**) to generate the outputs k-bit 'u_out' and 1-bit 'u_carry_out'. The outputs k-bit 'u_out' and 1-bit 'U_carry_out' are provided to FIFO **29** to generate the outputs k-bit 'u_min' and 1-bit 'u_carry'.

Referring to FIG. **6**, the processor elements (PEs) implement Montgomery's multiplication to generate the modular multiplication. By defining

$$A = \sum_{i=0}^{m-1} a_i 2^i, \quad B = \sum_{i=0}^{m-1} b_i 2^i, \quad N = \sum_{i=0}^{m-1} n_i 2^i \text{ and } U = \sum_{i=0}^{m-1} u_i 2^i$$

as the multiplier, multiplicand, modulo and modular product (result) respectively, for m bit integers where {a$_i$, b$_i$, n$_i$, u$_i$}∈{0,1}, the basic algorithm for Montgomery's multiplication is given as follows:

```
Module PE(A,B,U,N,m)
{U_{-1} := 0;
for i = 0 to m do
    q_i := (U_{i-1} + a_i B) mod 2; //LSB of U_{i-1} = u_{0,i-1}
    U_i := (U_{i-1} + q_i N + a_i B) div 2
endfor
return U_m
}
```

In order to optimize the Process Element (PE) sizes for a compact hardware implementation, instead of full m-size PE elements, k-size (where m=e×k) PE pairs are included and parameters A$^j$, B$^j$, N$^j$ and U$^j$ are included where

**6**

$$A = \sum_{j=0}^{e-1} A^j, \quad B = \sum_{j=0}^{e-1} B^j, \quad N = \sum_{j=0}^{e-1} N^j \text{ and } U = \sum_{j=0}^{e-1} U^j.$$

The algorithm is modified into:

```
//where superscripts = blocks, subscripts = bits and for
U_{i-1} = u_{0,i-1}, 0 is the first outer-loop.
    Module PE(A, B, U, N, m)
    {U_{-1} := 0;
    for i = 0 to m do
    // q_i is implemented using MUX6 39 and CSA 34
        q_i := q_{-1} + a_i b_0;

        (u_carry, U_i^0) = a_i B^0 + U_{i-1}^0;    // implemented using CSA 34
        (u_carry, U_i^0) = U_i^0 + q_i N^0 + u_carry;

        for j = 1 to e − 1 do

// perform (u_carry, U_i^j) = a_i B^j + U_{i-1}^j + q_i N^j + u_carry;
// implement using CSA 34, i.e.  U_i^j = (a_i & B^j) ⊕ U_{i-1}^j ⊕ u_carry
// u_carry = (a_i & B^j & u_carry) | (U_{i-1}^j & u_carry) | (a_i & B^j & U_{i-1}^j)

// results store as (cab's, uab's)

        (u_carry, U_i^j) = a_i B^j + U_{i-1}^j + u_carry;

// implement using CSA 35, i.e.  U_i^j = (q_i & N^j) ⊕ U_i^j ⊕ u_carry
// u_carry = (q_i & N^j & u_carry) | (U_i^j & u_carry) | (q_i & N^j & U_i^j)

// results store as (cnq's, unq's)

        (u_carry, U_i^j) = U_i^j + q_i N^j + u_carry;

// concatenate the LSB of U_j to MSB of U_{j-1} as carry &

// U_i^{j-1} := U_i^{j-1} div 2, implement using CLAs 32 and 49

// results store as (u_carry_out, u_out)

            U_i^{j-1} := (u_{0,i}^j, U_{k-1...1}^{j-1});

        endfor

    U_i^{(e-1)} := (u_carry, U_{k-1,i-1}^{(e-1)})
    endfor
    Return U_m
    }
```

In the preferred embodiment the Process Element **26** and the modified algorithm include a k-bit Carry Look-ahead Adder (CLA) **31**, a (k−1)-bit CLA **32**, a plurality of AND gates **33**, a plurality of Carry Save Adders (CSA) level **1 34** and level **2 35**, a plurality of Flip-flops **36**, a (k−1)-bit Flip-flop **37**, registers **38**, a Multiplexer MUX**6 39** and a single CLA **40**.

The outputs k-bit 'u_in' and 1-bit 'u_carry' of FIFO **29** are provided to a k-bit CLA **31** of Process Element **1** (PE**1**) **26**. For Process Element **2** (PE**1**), the outputs k-bit 'u_out1' and 1-bit 'u_carry1' are provided to a k-bit CLA **31**. The outputs k-bit 'b' (b1 or b2) of SRAM Block **13** and k-bit 'a_out' of Register**1** are provided bitwise to a plurality of two-input AND gates **33**. The outputs k-bit 'u[0:k−1]' of k-bit CLA **31**,

012

US 7,634,666 B2

**7**

1-bit 'u_carry' of FIFO **29** and 'ab[0:k−1]' of AND gates **33** are provided to level 1 CSA **34** to generate a plurality of add results 'uab[0:k−1]' and carry 'cab[0:k−1]'.

The outputs 1-bit 'q' of MUX**6** and k-bit 'n' (n1 or n2) of SRAM Block **13** are provided to a plurality of AND gates to generate a k-bit output 'nq[0:k−1]'. The outputs k-bit 'nq[0: k−1]' of a plurality of AND gates **33**, k-bit 'uab[0:k−1]'and k-bit 'cab[0:k−1]' are provided to level 2 CSA **35** to generate a plurality of add results 'unq[0:k−1]' and carry 'cnq[0:k−1]'. Preferably, the output 'cab[k−1]' goes through a Flip-flop (FF**3**) to bit-0 (of level 2) CSA **35**.

The outputs k-bit 'unq[0:k−1]'and 'cnq[0:k−1]' of a plurality of CSAs **35** are provided to a (k−1)-bit CLA **32** and 1-bit CLA **40** to generate the outputs k-bit 'u_out' and 1-bit 'u_carry_out'. Preferably, the output 'cnq(k−1)' of CSA goes through a Flip-flop (FF**4**) to CLA **40** and the output carry of (k−1)-bit CLA **32** goes through a Flip-flop (FF**5**) **36** to CLA **40**. Preferably, the outputs of (k−1)-bit CLA **32** go through a plurality of Flip-flops (FF**6**) **37** to generate the outputs 'u_out [0:k−2]' of 'u_out'.

The outputs 'uab[0]' of bit-0 CSA **34** and 1-bit delayed 'uab[0]' of Register**1** **38** are provided to MUX**6 39** to give output 'q' according to condition of an output 'load_a' of CLE **30**. The output 'q' of Register**1** **38** is generated according to the outputs 'uab[0]' of bit-0 CSA **34** and delayed 'load_a' from Register**3** of CLE **30**.

The outputs 1-bit 'load_a' of CLE **30** and 1-bit 'a' of Shift Register **28** are provided to Register**2** to generate an output of 1-bit 'a_out'.

Embodiments of the invention have been implemented using 0.35 μm semiconductor technology. A total gate count of 15K for RSA and 20K for both RSA and ECC was utilized for k=64. The benchmark testing for a 1024 (1024-bit) RSA is summarized in Table 1 as follows with an internal clock of 22 MHz.

TABLE 1

| Performance of various RSA operations | | | | |
|---|---|---|---|---|
| Exponent | No. of '1's | No. of '0's | Modulus | Computation time |
| 17 bit[1] | 2 | 15 | 1024 bit | 7 ms |
| 1024 bit[2] | 512 | 512 | 1024 bit | 607 ms |

[1] The public key e = $2^{16}$ + 1 = 65537 is used.
[2] Average case, 1024-bit exponent, 50% '1', 50% '0' in binary representation.

The benchmark device is capable of running at 100 MHz where the computational time can be reduced to 0.18 seconds for the worst case scenario.

With the heterogeneous computation ability, the process can be executed in a much higher clock rate using phase lock clock multiplier to allow faster computational and thus transaction time.

A implementation example of an RSA coprocessor is based on four special function registers (SFRs) RSAD,

**8**

RSAO, RSAS and RSAK in a host processor for controlling and monitoring the RSA coprocessor. A brief description of the SFRs now follows:

| | RSA DATA (RSAD) Bit: | | | | | | |
|---|---|---|---|---|---|---|---|
| 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
| RSAD.7 | RSAD.6 | RSAD.5 | RSAD.4 | RSAD.3 | RSAD.2 | RSAD.1 | RSAD.0 |

The bi-directional SFR is accessed via a mnemonic RSAD. Depending on the SFR RSAS, CPU and RSA coprocessor read from and write to this register. Data X, N and M are written at the beginning by software while Data M is read at the end by hardware. The RSAD is reset to 00h by a reset. There is unrestricted read/write access to this SFR.

| | | RSA OPCODE (RSAO) Bit: | | | | | |
|---|---|---|---|---|---|---|---|
| 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
| — | — | KEND | RST | WX | WN | RWM | RW |

The RSA Opcode Register with mnemonic RSAO receives instructions to configure the operation of the RSA coprocessor. This byte is set or cleared by software for the following purpose.

| KEND | Key End: This bit is set to tell the coprocessor the key writing is finished. |
|---|---|
| RST | Reset: This bit is set to reset the coprocessor synchronously. |
| WX | Write Precomputation Constant X: When this bit and RW are set, 128 bytes of data X are written into the coprocessor. When this bit is cleared, data X will not be written. |
| WN | Write Modulus N: When this bit and RW are set, 128 bytes of data N are written into the coprocessor. When this bit is cleared, data N will not be written. |
| RWM | Read Write Message M: When this bit and RW are set, 128 bytes of data M are written into the coprocessor. When this bit is set while RW is cleared, 128 bytes of data M are read from the coprocessor. When this bit is cleared, data M will not be read or written. |
| RW | Read Write Control: When this bit is set, data X, N, M will be written depends on bits WX, WN, RWM. When cleared, 128 bytes of data M are read from the coprocessor if RWM is set. |

All possible combination of read/write operation:
WN
RWM
RW
Read/Write Operation
1
0
0
1
Write data X
0
1

US 7,634,666 B2

| 9 | 10 |
|---|---|

0
1
Write data N
0
0
1
1
Write data M
1
1
0
1

| | | |
|---|---|---|
| WKR | Write Key Request: This bit is set to request the CPU to write the next byte of key to the SFR RSAK. | |
| RMR | Read Message Request: This bit is set to tell the CPU that the RSA operation is finish and it is ready to read the data M. It also requests the CPU to write instruction to read data M from RSAD. | |

The RSAS is reset to 00h by a reset.

There is restricted read only access to this SFR.

| RSA KEY (RSAK) Bit: | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
| RSAK.7 | RSAK.6 | RSAK.5 | RSAK.4 | RSAK.3 | RSAK.2 | RSAK.1 | RSAK.0 |

Write data X and N
1
0
1
1
Write data X and M
0
1
1
1
Write data N and M
1
1
1
1
Write data X, N and M
X
X
1
0
Read data M
X
X
0
0
No operation
0
0
0
X
No operation

The RSAO is reset to 00h by a reset. There is unrestricted read/write access to this SFR.

| RSA STATUS (RSAS) Bit: | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
| — | — | — | — | WKR | — | RMR | — |

The status with mnemonic RSAS of the RSA coprocessor is expected to shown in the RSA Status Register. This byte is set or clear by hardware for the following purpose.

The SFR with mnemonic RSAK will be used to store the key. One byte of RSA key, i.e. the exponent e or d is written into this register by software, while the bit WKR of the SFR RSAS is set. The RSAK is reset to 00h by a reset. There is unrestricted read/write access to this SFR.

The procedure of control the RSA coprocessor to carry out a RSA operation is summarized in FIGS. **7** and **8**. The sequence of operation is as follows:

1. The coprocessor must be reset at the beginning of RSA operation; the Reset (RST) bit is set (RSAO=10h) and cleared (RSAO=00h) to reset the coprocessor.

2. Two bytes of RSA key are then written to RSAK, starting from the most significant byte.

3. If the key ends, i.e. the key is less than or equal to 2 bytes, set the bit KEND of RSAO (RSAO=20h) to inform the coprocessor.

4. Set the Write operation by setting appropriate bits in RSAO, followed by writing the data block(s) in the order of data X, N and M into RSAD, starting from the least significant byte of first data block. For example, if RSAO=0Fh, 3×128 bytes of data X, N, and M are written to RSAD sequentially, starting from the least significant byte of data X; If RSAO=0Bh, 2×128 bytes of data X and M are written to RSAD sequentially, starting from the least significant byte of data X; If RSAO=09h, only 128 bytes of data X is written to RSAD, starting from the least significant byte of data X.

5. Check the WKR of RSAS to see whether the RSA coprocessor request next byte of key.

6. If the WKR is set, write one byte of key to RSAK.

7. If the key ends, i.e. all bytes of key is written into RSAK, set the bit KEND of RSAO (RSAO=20h) to inform the coprocessor.

8. Check the RMR to see whether the result data is ready to be read.

9. When it is ready to read the data, the read data M instruction is assigned to the RSAO (RSAO=02h). 128 bytes of data M are read from RSAD, starting from the least significant byte of data M.

Where in the foregoing description reference has been made to methods or elements have known equivalents then such are included as if individually set forth herein.

Embodiments of the invention have been described, however it is understood that variations, improvement or modifi-

014

US 7,634,666 B2

11

cations can take place without departure from the spirit of the invention or scope of the appended claims.

What is claimed is:

**1**. A crypto-engine for cryptographic processing of data comprising an arithmetic unit operable as a co-processor for a host processor and an interface controller for managing communications between the arithmetic unit and host processor, the arithmetic unit including:

    a memory unit for storing and loading data, the memory unit including

        an input switch for selecting input-interim data;

        a plurality of Static Random Access Memory elements for receiving and storing the input/interim data from the input switch;

        a plurality of output switches connected to the memory elements; and

    an address controller for controlling flow of the data through the switches and memory elements

    a multiplication unit, an addition unit and a sign inversion unit for performing arithmetic operations on said data, the multiplication unit, the addition unit and the sign inversion unit each having an output; and

    an arithmetic controller for controlling the storing and loading of data by the memory unit and for enabling the multiplication, addition and sign inversion units;

    wherein the outputs of the multiplication unit, the addition unit and the sign inversion unit are feedback to the arithmetic controller.

**2**. The crypto-engine of claim **1** wherein the multiplication unit comprises:

    a register to pre-store the multiplier data;

    a pair of multiplication elements for performing multiplication;

    a shift register to load the multiplier data bitwise into the multiplication elements; and

    a first-in-first-out register for synchronizing data movement between the multiplication elements.

**3**. The crypto-engine of claim **2** wherein the multiplication elements comprise a bitwise segmented multiplier, a bitwise segmented multiplicand, and a modulo for performing modular multiplication of the multiplier and multiplicand according to the modulo value.

**4**. A crypto-engine for cryptographic processing of data comprising an arithmetic unit operable as a co-processor for a host processor and an interface controller for managing communications between the arithmetic unit and host processor,

    the arithmetic unit including:

        a memory unit for storing and loading data;

        a multiplication unit, an addition unit and a sign inversion unit for performing arithmetic operations on said

12

        data, the multiplication unit, addition unit and sign inversion unit each having an output; and

        an arithmetic controller for controlling the storing and loading of data by the memory unit and for enabling the multiplication, addition and sign inversion units, wherein the outputs of the multiplication unit, an addition unit and a sign inversion unit are feedback to the arithmetic controller;

    the interface controller including:

    a bus interface for connecting high frequency manipulated data inside the arithmetic unit with the lower frequency manipulated data in the host processor;

    a concatenater/splitter for merging or splitting data width, and

    a cryptographic controller generating status and interrupt signals for the host processor and generating an op-code signal for the arithmetic unit, the arithmetic unit selecting RSA or EGO modes of operation based on the op-code signal.

**5**. The crypto-engine of claim **4** wherein the multiplication unit comprises:

    a register to pre-store the multiplier data;

    a pair of multiplication elements for performing multiplication;

    a shift register to load the multiplier data bitwise into the multiplication elements; and

    a first-in-first-out register for synchronizing data movement between the multiplication elements.

**6**. The crypto-engine of claim **5** wherein the multiplication elements comprise a bitwise segmented multiplier, a bitwise segmented multiplicand, and a modulo for performing modular multiplication of the multiplier and multiplicand according to the modulo value.

**7**. The crypto-engine of claim **5** wherein the memory unit has a size substantially equal to 384 bytes and the sign inversion unit has a k-size substantially equal to 64 bits.

**8**. The crypto-engine of claim **1** wherein the outputs of the multiplication unit, the addition unit and the sign inversion unit are feedback to the arithmetic controller and the memory unit.

**9**. The crypto-engine of claim **4** wherein the memory unit has a size substantially equal to 384 bytes and the sign inversion unit has a k-size substantially equal to 64 bits.

**10**. The crypto-engine of claim **4** wherein the multiplication unit, the addition unit and the sign inversion unit each having an output that is feedback to the arithmetic controller.

**11**. The crypto-engine of claim **10** wherein the outputs of the multiplication unit, the addition unit and the sign inversion unit are feedback to the arithmetic controller and the memory unit.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,634,666 B2                                    Page 1 of 1
APPLICATION NO.   : 10/641869
DATED             : December 15, 2009
INVENTOR(S)       : Cheng et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 12:
Line 18, delete "EGO" and substitute --ECC--.

Line 25, delete "registerto" and substitute --register to--.

Line 34, delete "claim 5" and substitute --claim 1--.

Signed and Sealed this

Thirtieth Day of March, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

016

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,634,666 B2                                    Page 1 of 1
APPLICATION NO. : 10/641869
DATED                  : December 15, 2009
INVENTOR(S)      : Cheng et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 983 days.

Signed and Sealed this

Ninth Day of November, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

**017**

**– A060 –**

## **PROOF OF SERVICE**

I hereby certify that on August 7, 2015, I caused this Corrected Brief of Appellants to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following CM/ECF users:  Jonathan M. Strang, Lori A. Gordon, Peter J. McAndrews, and Aaron F. Barkoff.

In addition, I certify that I served a copy of this Corrected Brief of Appellants via electronic mail to the following counsel and addresses:

- Jonathan M. Strang, jstrang@skgf.com
- Lori A. Gordon, lgordon-ptab@skgf.com
- Peter J. McAndrews, pmcandrews@mcandrews-ip.com
- Aaron F. Barkoff, abarkoff@mcandrews-ip.com

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Corrected Brief of Appellants will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

Dated:  August 7, 2015          /s/  *Kenneth R. Adamo*

                                            Kenneth R. Adamo

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32. According to the word processing system used to prepare it, the brief contains 9,036 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook.

/s/ *Kenneth R. Adamo*
Kenneth R. Adamo