2015-1837

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

INTERNATIONAL BUSINESS MACHINES CORPORATION,

*Appellant*,

v.

INTELLECTUAL VENTURES II LLC,

*Appellee*.

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, IPR2014-00180.

## BRIEF OF APPELLEE, INTELLECTUAL VENTURES

Peter J. McAndrews
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL 60661
(312) 775-8000

Jonathan M. Strang
Byron L. Pickard
Lori A. Gordon
STERNE, KESSLER, GOLDSTEIN & FOX,
P.L.L.C.
1100 New York Avenue, N.W.
Washington, D.C. 20005
(202) 772-8893

*Counsel for Appellee, Intellectual
Ventures II LLC*

Dated: October 14, 2015

# CERTIFICATE OF INTEREST

Counsel for the Appellee Intellectual Ventures II LLC certifies the following:

1.     The full name of every party or amicus represented by me is:

Intellectual Ventures II LLC.

2.     The name of the real party in interest represented by me is:

None.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:

None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**Sterne Kessler Goldstein & Fox PLLC**: Jonathan M. Strang, Byron L. Pickard, and Lori A. Gordon.

**McAndrews, Held & Malloy, Ltd.**: Herbert D. Hart, III, Peter J. McAndrews, and Aaron F. Barkoff.

**Intellectual Ventures II LLC:** Donald J. Coulman.

Dated: October 14, 2015          /s/ Jonathan M. Strang
                                 Jonathan M. Strang
                                 **Sterne Kessler Goldstein & Fox PLLC**
                                 1100 New York Ave., N.W.
                                 Washington, DC 20005
                                 202.371.2600

                                 *Counsel for Appellee,*
                                 *Intellectual Ventures II LLC*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................................1

COUNTERSTATEMENT OF THE ISSUES............................................................1

PRELIMINARY STATEMENT ...........................................................................2

COUNTERSTATEMENT OF THE FACTS ...........................................................5

I.     The '666 patent claims a crypto-engine for cryptographically processing
       data.......................................................................................................5

II.    Only two asserted prior-art references are relevant to this appeal:
       Matsuzaki and Dworkin.......................................................................8

       A.     Matsuzaki teaches only that the output of a single addition unit is
              feedback to a controller. .......................................................8

       B.     Dworkin teaches only that the output of a single generic sub-ALU
              unit is feedback to a controller. ..........................................10

III.   IBM shifted from one unpatentability theory to another, and then a third
       theory when seeking rehearing; the Board rejected all of them. ..................13

       A.     IBM argued in its petition that the combination of Matsuzaki and
              Dworkin taught that the outputs of multiplication, addition, and
              sign inversion units are "directly transmitted back" to the
              controller. ..............................................................................13

              1.     IBM proposed construing feedback as "directly transmitted
                     back." .........................................................................14

              2.     IBM argued that Dworkin taught the wherein clause's
                     "feedback" because Dworkin disclosed sending the outputs
                     of multiple units *directly* to a controller over a data bus. .........14

              3.     IBM presented a single reason in its petition to combine
                     Matsuzaki with Dworkin: According to IBM, the references
                     are similar...............................................................15

i

B.    The Board instituted trial but adopted a broader construction of "feedback" that did not require "direct" transmission as IBM proposed. ...........................................................................16

C.    In response to IBM's petition, Intellectual Ventures countered IBM's arguments regarding the Dworkin disclosure and its motivation to combine argument.........................................................16

    1.    Intellectual Ventures showed that only one of Dworkin's sub-ALU sends its output to the controller; the rest send their outputs to other identical sub-ALUs................................16

    2.    Intellectual Ventures showed that IBM did not present a sufficient rationale to combine these fundamentally different hardware solutions. ...................................................17

D.    In reply, IBM offered a new theory of Dworkin's operation, but it did not contend that the claims read on Intellectual Ventures' explanation of Dworkin's operation....................................................18

E.    The Board found the claims are not unpatentable, crediting Intellectual Ventures' Dworkin Figure 6 explanation and finding that IBM's alleged similarities and invocation of common sense are not a sufficient rationale to combine the references.....................20

    1.    The Board construed the wherein clause according to the plain language of the claims consistent with the specification. ...........................................................................20

    2.    The Board found that the art did not teach the wherein clause, agreeing with Intellectual Ventures' explanation of Dworkin and rejecting IBM's two theories. ............................21

    3.    The Board found that IBM did not articulate a sufficient rationale to combine the teachings of Matsuzaki and Dworkin. ..................................................................23

F.    IBM requested rehearing, offering a third new obviousness theory, and the Board upheld its decision of no unpatentability.....................24

SUMMARY OF ARGUMENT ..............................................................25

ARGUMENT .......................................................................................26

I.    This Court should affirm because the Board properly construed the wherein clause according the undisputed meaning of "feedback" and the plain-language meaning of the remaining terms. ..........................................26

      A.    The plain language of the wherein clause requires transmitting the units' outputs to the arithmetic controller. ..........................................27

      B.    The Board's construction of the wherein clause was fair to IBM. .....29

            1.    The Board's construction held IBM to the same standard IBM set for itself in its petition..................................................30

            2.    IBM was on notice of the present claim-construction issue before it filed its reply..............................................................31

      C.    IBM waived its claim-construction argument because IBM delayed presenting it until the Request for Rehearing. .......................32

            1.    In its petition, IBM argued that the wherein clause requires sending each of the three outputs directly (and therefore unchanged) to the controller. ....................................................33

            2.    In response, Intellectual Ventures pointed to Dworkin's Figure 6 to demonstrate that Dworkin did not teach feedback from multiple sub-ALUs. ..........................................34

            3.    IBM did not argue in reply that the wherein clause should be construed to encompass Intellectual Ventures' explanation of Dworkin. ...........................................................35

            4.    On appeal, IBM muddies the record by using shift-left terminology to refer Intellectual Ventures' Figure 6 explanation of Dworkin. ........................................................35

II.   This Court should affirm because substantial evidence supports the Board's factual finding that IBM failed to show a reason to combine Matsuzaki and Dworkin..............................................................................37

      A.    The Board applied the correct legal standard in finding IBM failed to articulate how or why one of skill would have combined the references.............................................................................................38

1.    The Board correctly decided that IBM had the burden to show how and why one of skill would have combined the teachings of Matsuzaki and Dworkin. ......................................39

2.    The Board did not require IBM to physically combine the references. ..............................................................................40

B.    The Board did not legally err in finding that Dr. Koç's invocation of "common sense" was insufficient.................................................42

C.    Substantial evidence supports the Board's finding that IBM did not articulate sufficient reasoning with a rational underpinning to support the legal conclusion of obviousness......................................44

CONCLUSION ........................................................................................................48

# TABLE OF AUTHORITIES

## Cases

*Duramed Pharm., Inc. v. Watson Labs., Inc.*,
413 F. App'x 289 (Fed. Cir. 2011) ....................................................42, 43

*In re Baxter Int'l*,
678 F.3d 1357 (Fed. Cir. 2012)...............................................................32

*InTouch Techs. v. VGO Commc'ns*,
751 F.3d 1327 (Fed. Cir. 2014)........................................................39, 44

*I/P Engine, Inc. v. AOL Inc.*,
576 F. App'x 982 (Fed. Cir. 2014) ..................................................42, 43

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012)............................................39, 42, 45, 46

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007)..................................................................................39

*Wyers v. Master Lock Co.*,
616 F.3d 1231 (Fed. Cir. 2010)................................................................42

## Statutes

35 U.S.C. § 316(e) ...................................................................................39

## Regulations

37 C.F.R. § 42.2 ......................................................................................39
37 C.F.R. § 42.104 ...................................................................................39

## STATEMENT OF RELATED CASES

IBM's statement of related cases is accurate.

## COUNTERSTATEMENT OF THE ISSUES

This Court may affirm the Board's decision if it agrees with Intellectual Ventures on any one of these three independent issues:

1. Whether the Board's construction of "wherein the outputs of the multiplication unit, the addition unit and the sign inversion unit are feedback to the arithmetic controller" as "the output values of the multiplication unit, the addition unit, and the sign inversion unit are feedback to the arithmetic controller, although those values may pass, unchanged, through intermediate components (e.g., latches and multiplexers)" is the broadest reasonable interpretation.

2. Whether IBM waived its claim-construction arguments that: (i) were first presented to the Board in IBM's Request for Rehearing; and (ii) contradict the construction IBM presented to the Board before the Board entered its Final Written Decision.

3. Whether substantial evidence supports the Board's fact finding that IBM did not show a sufficient reason to combine the asserted references where IBM merely invoked the phrase "common sense" and alleged the art was similar and there was conflicting evidence on the issue.

## PRELIMINARY STATEMENT

IBM states that the Board incorrectly construed the wherein clause "based entirely upon arguments made by IV at the oral hearing that had never previously been raised in either parties' briefing—arguments made in violation of the PTAB's own rules and binding decisions to which IBM never had the opportunity to respond." Blue Br. 1. That is not the case.

The Board construed the wherein clause "[b]ased on the evidence and arguments presented in the Petition and the PO Response." A35. And there was nothing untoward in Intellectual's Ventures' discussion of the wherein clause during the oral argument. The Board asked Intellectual Ventures how it construed "feedback" to "focus the dispute between the parties as reflected in the Petition and PO Response." A35, A406-07. Intellectual Ventures responded that "if feedback is routed through intermediate components that change its value, the data would no longer be feedback of that value." A9 (citing A406-07). There was nothing new in this response because it was the gist of Intellectual Ventures' patentability arguments presented in its patent owner response. A297-300.

The real procedural problem in this case is one that IBM created: it argued a different invalidity theory in every paper that it submitted to the Board. A37-38 (Board recounting the three separate theories in IBM's petition, reply, and request for rehearing). In its petition, IBM offered its first theory of how a mathematical

processor disclosed in the Dworkin reference works and, based on that technical theory, argued that a skilled artisan would have combined the art's teaching because the references were similar. In response, Intellectual Ventures showed that IBM's first theory of Dworkin's operation was wrong and showed how Dworkin actually works. IBM responded by offering a new, conflicting theory of Dworkin's operation, but it did not argue that the claims nevertheless read on Intellectual Ventures' explanation of Dworkin. Despite introducing a new technical theory for how Dworkin works, IBM did not update its evidence for a motivation to combine the art.

Ultimately the Board agreed with Intellectual Ventures' explanation of the art and rejected IBM's, finding the claims were not unpatentable. The Board decision rested on two primary points. First, Dworkin did not disclose the claimed feedback recited in the wherein clause. Second, IBM failed to show there was a reason to combine the art. IBM then sought rehearing, arguing that the claims should be construed to read on Intellectual Ventures' explanation of how Dworkin's processor works—an argument that IBM could have raised, but did not, before the Board decided the case. The Board rejected IBM's latest (third) unpatentability theory. A37-38.

This appeal followed, with IBM asking this Court to find in its favor on the arguments it raised for the first time in its rehearing request to the Board. IBM

attempts to conceal its shifting-sands litigation strategy from this Court by incorrectly stating that the Board adopted "the parties' explanation of Dworkin's 'shift left' operation." Blue Br. 34. IBM's deceit here is two-fold: (i) the Board did not adopt "the parties' explanation," rather, it adopted Intellectual Ventures' explanation; and (ii) the only Dworkin shift-left explanation in this proceeding was presented by IBM in its reply and was rejected by the Board. A19-20 (rejecting IBM's shift-left theory and adopting Intellectual Ventures' explanation because it is "consistent with what is depicted clearly in [Dworkin's] Figure 6"); A38 (recounting IBM's "second theory of Dworkin's operation" and rejecting it).

IBM did not arrive at its current claim-construction position until *after* the Board found that IBM's first two Dworkin theories (petition and reply) were wrong as a matter of fact, and that Intellectual Ventures was right all along. A34-38. To be sure, IBM asked for a narrower construction in its petition, requiring each unit to send its output directly, and therefore unchanged, to the controller. A37 (citing A196). The Board construed the wherein clause more broadly, allowing both direct and indirect feedback. On appeal, and in its request for rehearing, IBM argues that the claims read on Intellectual Ventures' explanation of Dworkin. They do not, but it is too late. IBM should have made that argument in its petition or at the very latest in its reply, after Intellectual Ventures explained how Dworkin works.

Likewise, IBM did not proffer a sufficient reason to combine, in part because it addressed only the combination of Matsuzaki with its first theory of Dworkin. A39-40. It never addressed combining Matsuzaki's teachings with its current (*i.e.*, Intellectual Ventures' correct) Dworkin explanation, instead relying on superficial similarities between the references and its expert's bare recitation of "common sense." A23; A26; A40. And doing so would be especially difficult because Dworkin is now superfluous: like Matsuzaki, only one of Dworkin's units feeds back to the controller, and the other two units feed that one unit.

## COUNTERSTATEMENT OF THE FACTS

I.     **The '666 patent claims a crypto-engine for cryptographically processing data.**

U.S. Patent No. 7,634,666 describes an architecture that performs cryptographic processing, including modular multiplication. Two public-key encryption protocols Rivest-Shamir-Adleman (RSA) and Elliptic Curve Cryptography (ECC) use the type of modular multiplication described in the '666 patent. A53 (1:7-11).

The claims at issue recite an "arithmetic unit" that includes a multiplication unit, addition unit, and sign inversion unit, the outputs of which are feedback to an arithmetic controller. Claim 1 recites:

1. A crypto-engine for cryptographic processing of data comprising an arithmetic unit operable as a co-processor for a host processor and an

5

interface controller for managing communications between the arithmetic unit and host processor, the *arithmetic unit* including:

a memory unit for storing and loading data, the memory unit including

>  an input switch for selecting input-interim data;

>  a plurality of Static Random Access Memory elements for receiving and storing the input/interim data from the input switch;

>  a plurality of output switches connected to the memory elements; and

>  an address controller for controlling flow of the data through the switches and memory elements

*a multiplication unit, an addition unit and a sign inversion unit* for performing arithmetic operations on said data, the multiplication unit, the addition unit and the sign inversion unit each having an output; and

an arithmetic controller for controlling the storing and loading of data by the memory unit and for enabling the multiplication, addition and sign inversion units;

*wherein the outputs of the multiplication unit, the addition unit and the sign inversion unit are feedback to the arithmetic controller.*

A58 (emphasis added). Claim 4, the only other independent claim, recites the same wherein clause. *Id.*

The Board determined that the plain language of the wherein clause requires outputs from arithmetic units to be sent unchanged to the controller: "We construe [the wherein clause] to mean that the output values of the multiplication unit, the addition unit, and the sign inversion unit are feedback to the arithmetic controller,

although those values may pass, unchanged, through intermediate components (e.g., latches and multiplexers)." A9.[1]

The Board reasoned that this construction is consistent with the plain language of the claims: "if feedback is routed through intermediate components that change its value, the data would no longer be feedback of that value." A9. The Board further found that this construction is "consistent with the testimony of Petitioner's Declarant, Dr. Çetin Koç, Ph.D." A9 (citing A731-32).

In this appeal, IBM asserts that the Board misconstrued "feedback" in the wherein clause and, as a result, did not properly apply the asserted art against the claims. In its petition below, IBM argued that the wherein clause required "direct" transmission of the outputs to the controller. A174-75. In IBM's view, the outputs had to pass from the units to the controller without passing through intermediate circuit components. Because the outputs passed directly to the controller, those outputs must have been unchanged. A37.

The Board's construction under review in this appeal is broader than IBM's proposed construction because the Board's construction allowed the output to be fed back "directly" (as IBM proposed) and "indirectly" (which IBM's proposal

---

[1] The parties agree that the circuit illustrated by Figure 2 of the '666 patent may include a multiplexer in the temp_data bus to prevent the outputs from the multiplication unit, addition unit, and sign inversion unit from colliding. Blue Br. 25, 37.

would have excluded). At the same time, the Board's construction kept intact the requirement that the output values of the units reach the controller without being changed, for example by an intermediate arithmetic unit.

## II.    Only two asserted prior-art references are relevant to this appeal: Matsuzaki and Dworkin.

Two references are at issue on appeal:

- U.S. Patent No. 6,963,644 to Matsuzaki, *et al*., and

- U.S. Patent No. 6,009,450 to Dworkin, *et al*.

The Board instituted this IPR on IBM's proposed grounds that the independent claims are obvious over Matsuzaki and Dworkin, with other references cited for the dependent claims. However, those other references are not at issue in this appeal.

### A.    Matsuzaki teaches only that the output of a single addition unit is feedback to a controller.

Matsuzaki discloses a co-processer for cryptographic processing of data with an arithmetic unit that includes a multiplier unit, an addition unit, and a sign inversion unit. A11-14 (the Board's description of Matsuzaki); A329-30 (citing A966-67 at ¶ 73); A83 (8:48-65); A188, A194; A479-80. But the Board found that only the adder's output is fed back to the controller. The outputs of the "multiplier and sign inversion unit are fed to the adder, rather than the controller." A15. Although the adder calculates its own output based in part on the values it receives

from the multiplier and sign inversion unit, those two units' outputs are not

feedback to the controller: "The adder operates on (and, thus, changes) those

values and outputs a single feedback to the controller." A15-16. Matsuzaki's

Figure 17 illustrates this fact:



A188 (as annotated by IBM in its petition).[2]

---

[2] The parties agree that Matsuzaki's three-input adder 22 accepts outputs from
the multiplier and the sign inverting unit, and calculates a 66-bit result that
includes carry bits that are feedback to a controller. A188.

### B. Dworkin teaches only that the output of a single generic sub-ALU unit is feedback to a controller.

Dworkin describes an arithmetic unit for performing cryptography that includes multiple, identical sub-arithmetic-logic units, called "sub-ALUs." Each sub-ALU performs arithmetic on five one-bit inputs and sends a one-bit result to a corresponding accumulator, the C register, as shown in Figures 2 and 6 of the Dworkin patent. A93, A97.

Dworkin's Figure 2 depicts an arithmetic unit with a controller (20) and sub-ALUs (18), but it does not show the details of the sub-ALU's internals or their interconnections to the special-purpose registers (16):



A93 (annotated).

10

Intellectual Ventures showed (and the Board ultimately agreed) that each of Dworkin's sub-ALUs (18) in Figure 2 is configured as shown inside the dashed-line boxes 70 of Dworkin's Figure 6:



*FIG. 6*

A97 (annotated); A297-300 (Intellectual Ventures' discussion of Dworkin's Figures 5 and 6); A19 (Board finding Intellectual Ventures' evidence and arguments "are persuasive as they are consistent with what is depicted clearly in Figure 6.").

Based on Intellectual Ventures' evidence of how Dworkin works, the Board found that "the output of only the left-most sub-ALU of Figure 2 is feedback to the

11

controller" and that "the output of each sub-ALU 18 other than the left-most sub-ALU 18 is fed as an input to the next sub-ALU to the left rather than fed back to the controller." A19-20; *see also* A37.

Specifically, each of Dworkin's sub-ALUs calculates a single bit of a larger result that is stored in Dworkin's C register. To calculate that one-bit result, each sub-ALU performs the logical operations on the five one-bit inputs from the four special-purpose registers (A, B, C, and M registers), and sends the one-bit result to the corresponding cell of the C register. Blue Br. 36; A960-963 (at ¶¶ 59-63). The C register holds intermediate results and, eventually, the final result. Blue Br. 36; A19-20; A297-300 (citing A959-963 at ¶¶ 57- 65, A974 at ¶ 89); A394-98.

Only the output from the leftmost sub-ALU (which populates the left-most cell of the C register) is feedback to the controller because only the leftmost cell of the C register, $c_m$, is visible to the controller. A19; A299; A397; A963.

Each of the remaining sub-ALUs sends its output to the sub-ALU to its immediate left via the C register. That is, each sub-ALU sends its one-bit output to the corresponding bit of the C register, and, on the next iteration, that bit will be one of the five one-bit inputs into the sub-ALU to its left. A19-20; A297-300 (citing A959-63, A974).

**III.    IBM shifted from one unpatentability theory to another, and then a third theory when seeking rehearing; the Board rejected all of them.**

In the IPR proceeding, IBM took a shifting-sands approach, changing from the one unpatentability theory in its petition to a second one in its reply and then changing to a third theory in a rehearing request. IBM contended in its petition that Dworkin's sub-ALUs *directly* transmit their outputs to the controller through a data bus. Intellectual Ventures showed that to be incorrect in its response; IBM then pivoted, arguing in reply that Dworkin's pseudocode shows that the C register repeatedly shifts left to transfer its bits (and thus the outputs of the sub-ALUs) to the controller unchanged. The Board rejected both of IBM's theories in the Final Written Decision and agreed with Intellectual Ventures. IBM then switched again, arguing for the first time in its rehearing request that Intellectual Ventures' explanation of Dworkin was correct, but nevertheless is encompassed by IBM's new claim construction.

**A.    IBM argued in its petition that the combination of Matsuzaki and Dworkin taught that the outputs of multiplication, addition, and sign inversion units are "directly transmitted back" to the controller.**

In its petition, IBM contended that the independent claims of the '666 patent would have been obvious over Matsuzaki and Dworkin, arguing that the wherein clause was met because the combination taught that the outputs of multiplication,

addition, and sign-inversion units were *directly* transmitted back to the controller. A188, A196.

### 1. IBM proposed construing feedback as "directly transmitted back."

In its petition, IBM proposed that the "feedback" of the wherein clause should be construed as "a result that is directly transmitted back," asserting that this narrow definition "is consistent with the plain meaning and supported by the contextual language" of the claims and the specification. A174-75.

### 2. IBM argued that Dworkin taught the wherein clause's "feedback" because Dworkin disclosed sending the outputs of multiple units *directly* to a controller over a data bus.

IBM acknowledged that Matsuzaki did not teach "that 'outputs' (plural) of the multiplication unit, the addition unit, and the sign inversion unit are directly sent back to the arithmetic controller," so it turned to Dworkin. A183, A197. In its claim chart, IBM stated that Dworkin taught the "feedback" limitation because its outputs were sent directly to the controller:

> Dworkin discloses outputs that are feedback. Dworkin discloses wherein the outputs of the multiplication unit (e.g., sub-ALU 18), the addition unit (e.g., sub-ALU 18) and the sign inversion unit (e.g., sub-ALU 18) *are directly sent back* to the arithmetic controller (e.g., controller 20).

A196 (emphasis added); *see also* A505 (IBM's expert, Dr. Koç, stating: "The output from each sub-ALU 18 is directly sent back to controller 20 over an output data bus 30."); *see also* A188, A223 ("Each sub ALU 18 includes an output data

14

bus 30 that directly sends the output of each sub ALU 18 back to the controller

20."). IBM made the same argument for claim 4. A205.

> **3. IBM presented a single reason in its petition to combine Matsuzaki with Dworkin: According to IBM, the references are similar.**

IBM presented its entire motivation-to-combine argument in a single

paragraph:

> Both Matsuzaki and Dworkin address hardware implementations of fast cryptographic co-processors. (Ex. 1001, Koç Decl., ¶ 145.) Matsuzaki and Dworkin also teach Montgomery reduction, similar methods of processing cryptographic data, and internal control methodology. (Ex. 1001, Koç Decl., ¶¶ 146–48.) Therefore, one having ordinary skill in the art would combine the "outputs" (plural) of Dworkin with the disclosure of Matsuzaki. (Ex. 1001, Koç Decl., ¶¶ 116, 149.)

A197 (citing A504, A517-19); A23. IBM also submitted an expert-witness

declaration, which addressed certain similarities and invoked the term "common

sense." But neither IBM nor its expert witness explained why it would have been

common sense to combine Matsuzaki with Dworkin. A24-26; A519 at ¶ 149.

**B.**    **The Board instituted trial but adopted a broader construction of "feedback" that did not require "direct" transmission as IBM proposed.**

The Board instituted trial against claims 1-11 of the '666 patent over Matsuzaki and Dworkin.[3] The Board, however, disagreed with IBM's narrow construction of "feedback" and preliminarily construed it to mean "transmitted back," omitting the requirement of "direct" transmission. A259.

**C.**    **In response to IBM's petition, Intellectual Ventures countered IBM's arguments regarding the Dworkin disclosure and its motivation to combine argument.**

Faced only with what IBM had argued so far, Intellectual Ventures addressed the arguments in IBM's petition. Relevant to this appeal, Intellectual Ventures addressed IBM's arguments that: (i) all of Dworkin's sub-ALUs send their outputs directly to the controller; and (ii) some superficial similarities between the references would have been a sufficient rationale to combine.

**1.**    **Intellectual Ventures showed that only one of Dworkin's sub-ALU sends its output to the controller; the rest send their outputs to other identical sub-ALUs.**

Intellectual Ventures presented evidence in its response showing that IBM's direct-transmission theory for Dworkin was wrong: Dworkin's sub-ALUs do not send their outputs to the controller via data bus 30. A297-300 (reproducing and

---

[3] The trial included a third reference and "knowledge of one having ordinary skill in the art" in combination with Matsuzaki and Dworkin for dependent claims 2, 3, 5, 6, 7, and 9. A274. This additional art is not relevant here.

discussing Figure 6). The Board credited Intellectual Ventures' evidence and agreed that Dworkin did not function as IBM theorized. A19.

Instead, as shown in Dworkin's Figure 6 reproduced above, only the left-most sub-ALU sends its output to the controller via the leftmost bit of the C register. All of the other sub-ALUs send their outputs (via the C register) to an identical sub-ALU to its immediate left.

> **2.    Intellectual Ventures showed that IBM did not present a sufficient rationale to combine these fundamentally different hardware solutions.**

In response to IBM's petition, Intellectual Ventures also showed that IBM's allegations of similarities between Matsuzaki and Dworkin were not a sufficient motivation to combine, demonstrating the "very different design philosophies" of the two designs. A313-21, A328-30.

Although both Matsuzaki and Dworkin generally are directed to hardware for performing mathematical calculations for cryptographic protocols (as IBM asserts), they approach the problem differently. Matsuzaki discloses distinctly different units—multiplier, adder, and sign inverter—operating on word-length (32-bit) inputs with word- or double-word length outputs. A329 (citing A966-67 at ¶ 73); *see also* A78. In contrast, Dworkin discloses identically configured sub-ALUs, each calculating a single bit of a word-length (*e.g.*, 32-bit) result from five different single-bit inputs. A329-30 (citing A966-67 at ¶ 73); *see also* A96, A97.

17

As a result, there would have been no reason to combine these two "incompatible, alternative designs." A967 ("One of ordinary skill in the art might consider implementing one or the other design, but would not combine both into a single design."); A329-30.

### D.    In reply, IBM offered a new theory of Dworkin's operation, but it did not contend that the claims read on Intellectual Ventures' explanation of Dworkin's operation.

In its reply (as in its petition), IBM did not argue that the wherein clause should be construed to encompass Intellectual Ventures' showing of how Dworkin worked, as it does now on appeal. In fact, IBM did not make any claim-construction arguments in its reply. *See* A338-53. Instead, IBM attacked Intellectual Ventures' Dworkin explanation, stating that Intellectual Ventures "ma[de] a complex (and technically incorrect) argument regarding the feedback element," and provided its own *new* Dworkin theory. A344. Specifically, IBM pointed to Dworkin's modular-multiplication pseudocode, arguing the pseudocode shows that the C register, which IBM now agreed receives a one-bit output from each of the sub-ALUs, shifts left an increasing number of times each iteration to transfer each sub-ALU's output bit to the controller. A344-48.

The Board accurately summarized IBM's new Dworkin arguments in its decision denying rehearing:

Petitioner . . . introduced [its] second theory of Dworkin's operation, supported by a new declaration from its expert. In particular, the

Reply contended that Patent Owner's description of Dworkin was incorrect and that the outputs of each of the sub-ALUs themselves (not values changed by intermediate calculations) were left-shifted to the controller. Reply 8-9.

A37-38 (citing A346-47).

By arguing that the C register shifts each of the sub-ALU's output bits into the controller, IBM maintained its position that Dworkin's controller receives feedback of multiple outputs—one from each sub-ALU—and not some other values. A183; A341 (discussing "the 'outputs' (plural) of Dworkin"); A344-48 (arguing that Dworkin's sub-ALUs send their outputs to the C register, which shifts them left into the controller).

IBM also argued that Dworkin's C register shifts left to keep the multiple unchanged outputs from colliding, exactly like the multiplexer in the '666 patent. A348 ("The partial results are, as in Dworkin, fed back to the controller at different clock cycles . . . feedback of these signals requires multiplexing; otherwise, they will collide."); A347 ("Dworkin's shift left operation . . . is identical to the feedback operation of the '666 Patent."). But although the Board's claim construction recognized that outputs may pass unchanged through a multiplexer, the Board did not agree that IBM's explanation accurately portrayed Dworkin's content.

19

**E.    The Board found the claims are not unpatentable, crediting Intellectual Ventures' Dworkin Figure 6 explanation and finding that IBM's alleged similarities and invocation of common sense are not a sufficient rationale to combine the references.**

In its Final Written Decision, the Board found the challenged claims unpatentable for two reasons. First, it credited Intellectual Ventures' explanation of Dworkin, which relied on Figure 6 to show that only one sub-ALU sends its output to the controller. Second, it found that IBM's allegations of similarities (even if true) and its unexplained invocation of common sense were not a sufficient motivation to combine.

**1.    The Board construed the wherein clause according to the plain language of the claims consistent with the specification.**

The Board correctly recognized that "[IBM] does not challenge our initial construction of 'feedback' in its Reply," and proceeded to construe the wherein clause based on the evidence and argument in the record at that time. A9. The Board acknowledged that Intellectual Ventures contended that "if feedback is routed through intermediate components that change its value, the data would no longer be feedback of that value." *Id.* And the Board agreed that this position is "consistent with" the broadest reasonable interpretation, that is, "the plain language of the claims and the Specification." *Id*. The Board also noted that IBM's expert, Dr. Koç, "testifie[d] that the temp_data signals [in Figure 2] of the '666 patent are multiplexed from the computational units to the controller." *Id*.

20

The Board therefore construed the entire wherein clause to mean "that the output values of the multiplication unit, the addition unit, and the sign inversion unit are feedback to the arithmetic controller, although those values may pass, unchanged, through intermediate components (e.g., latches and multiplexers)." *Id*.

## 2. The Board found that the art did not teach the wherein clause, agreeing with Intellectual Ventures' explanation of Dworkin and rejecting IBM's two theories.

The Board found that IBM did not meet its burden to show that the art teaches feedback because "[IBM] and its Declarant [Dr. Koç] failed to provide a detailed analysis of Dworkin in the Petition and further have failed to address, in the Reply, Patent Owner's rebuttal evidence, which we find very persuasive." A20-21.

The Board began its analysis by finding that Matsuzaki does not teach feedback from the three units because two of those units feed the adder, and only the adder sends its output to the controller:

> As can be seen in Figure 17 [shown below] the outputs of the multiplier and sign inversion unit are fed to the adder, rather than the controller. The adder operates on (and, thus, changes) those values and outputs a single feedback to the controller. Thus, we find that Matsuzaki does not disclose the feedback limitation of claims 1 and 4.



A188 (citing A63, annotated by IBM).

Turning to Dworkin, the Board specifically evaluated Intellectual Ventures' explanation of Dworkin's disclosure, concluding that "Patent Owner's arguments and evidence are persuasive as they are consistent with what is depicted clearly in Figure 6." A18-19.

In evaluating IBM's arguments and evidence, the Board first noted that IBM conceded its argument from the petition that Dworkin disclosed sending the outputs from a multiplication unit, an addition unit, and a sign inversion unit directly to the controller. The Board found that IBM did not argue that Dworkin

taught "feed[ing] the outputs of multiple generic computational units directly to a controller" until its reply. A16-17.

Even so, the Board analyzed IBM's belated reply arguments and determined that IBM did not show that Dworkin teaches the wherein clause, instead finding that "Patent Owner has presented persuasive evidence that Dworkin does not feedback the outputs of multiple computational units to a controller. Petitioner's Reply evidence and argument does not rebut adequately Patent Owner's position." A17.

### 3. The Board found that IBM did not articulate a sufficient rationale to combine the teachings of Matsuzaki and Dworkin.

The Board also rejected IBM's motivation to combine arguments, noting that "contrary to Petitioner's argument at the hearing, the only reason to combine stated in the Petition itself is the purported similarities between the references." A23 (block-quoting IBM's motivation-to-combine argument from A197).

The Board, however, again exercised its discretion and also considered arguments that were presented only in IBM's expert declaration (rather than its petition), concluding that IBM's allegations of similarities and invocation of the words "common sense" were not enough here because the technology is complicated. A29.

**F.    IBM requested rehearing, offering a third new obviousness theory, and the Board upheld its decision of no unpatentability.**

On rehearing, IBM changed course once again, adopting Intellectual Ventures' explanation of Dworkin's operation (which the Board had credited) as its own. For the first time, IBM argued that the wherein clause should be broad enough to cover Dworkin as explained by Intellectual Ventures. A432-35; A435-36. The Board rejected IBM's new arguments as untimely.

When adopting the Dworkin Figure 6 explanation as its own, IBM asserted that this was the argument it was making all along:

> The panel then credited IV's explanation of <u>Dworkin</u> that "the output of each sub-ALU 18 other than the left-most sub-ALU 18 is fed as an input to the next sub-ALU to the left rather than fed back to the controller." . . . *This is precisely what IBM repeatedly demonstrated by evidence timely made of record throughout this proceeding.*

A435-36 (italics added). The Board was not fooled and stated:

> We disagree that Petitioner presented any such evidence or argument in either the Petition or the Reply. Rather, this is a third, new theory of Dworkin's operation presented for the first time in the Request.

A37. The Board recounted each of IBM's different arguments and concluded that it could not have overlooked IBM's new arguments because they had not been made. A36-38.

The Board also explained that it had based its claim construction in the final written decision "on the evidence and arguments presented in the Petition and the

PO Response," and that it did not overlook any timely evidence or arguments. A34-36.

Also, the Board addressed IBM's blanket objection to "all of the detailed Dworkin argument" Intellectual Ventures presented at the oral argument (A423-24 at 61:13-62:7), stating that it was "unable to discern how Petitioner's generic objection to Patent Owner's detailed explanation of Dworkin was directed to the purportedly new claim construction argument," but "to the extent Petitioner believes it properly objected to Patent Owner's candid response to the panel's questions regarding the scope of 'feedback,' that objection is overruled." A35-36.

## SUMMARY OF ARGUMENT

This Court should affirm the Board's decision on any one of three independent grounds. First, this Court should affirm because the Board correctly construed the claims' wherein clause according to its plain meaning—in fact construing the phrase more broadly than proposed by IBM in its petition. IBM does not argue that the art teaches the claim elements under the Board's construction. Therefore, if this Court affirms that construction, no other issue must be decided.

Second, this Court should affirm because IBM waived its claim-construction argument. IBM did not argue for the claim construction that it asks this Court to impose until after the Board had issued the Final Written Decision, when it sought

a rehearing in the case. But IBM could have raised this claim-construction much earlier in the IPR below. Intellectual Ventures showed that Dworkin did not work as IBM had postulated in its petition. Instead of arguing in its reply that the claims nevertheless encompassed Intellectual Ventures' explanation of Dworkin (which it now does on this appeal), IBM proffered a new theory for how Dworkin worked. It is too late for IBM to argue its new claim-construction theory.

Third, the Court should affirm because substantial evidence supports the Board's finding that IBM did not articulate a sufficient reason to combine the two asserted references. The Board correctly found that the technology at issue here is sufficiently complex that IBM's allegation of similarity and its expert's unexplained invocation of "common sense" were not enough of a reason for a skilled artisan to combine them. What's more, IBM's evidence and arguments on this point are based on a technical theory of how Dworkin worked that the Board found, as a matter of fact, was an incorrect theory. This too provides an independent basis to affirm.

## ARGUMENT

**I.  This Court should affirm because the Board properly construed the wherein clause according the undisputed meaning of "feedback" and the plain-language meaning of the remaining terms.**

The parties' claim-construction dispute is limited to a single clause:

"wherein the outputs of the multiplication unit, the addition unit and the sign

inversion unit are feedback to the arithmetic controller." What is more, the parties' dispute is focused on a discrete part of this clause: Whether these output values must be fed back, without modification, or can be modified before reaching the controller.

The Board correctly determined that the outputs of the units must be sent back to the controller: "the output values of the multiplication unit, the addition unit, and the sign inversion unit are feedback to the arithmetic controller, although those values may pass, unchanged, through intermediate components (e.g., latches and multiplexers)." A9.

IBM appeals the Board's claim construction. First, IBM contends that the outputs can be changed. Second, IBM argues that it was deprived of a fair opportunity to address the claim-construction issue. The Board's construction is the correct one, and IBM had a fair opportunity to argue its case below. This Court should affirm.

## A.  The plain language of the wherein clause requires transmitting the units' outputs to the arithmetic controller.

The plain language of the wherein clause requires the outputs of the units, not some other values, to be sent back to the controller. The clause recites: "wherein the outputs of the multiplication unit, the addition unit and the sign inversion unit are feedback to the arithmetic controller." If feedback of a unit is routed through an intermediate component and its value is changed, then that value

would no longer be feedback of that unit. The clause therefore does not encompass, as IBM argues, a daisy-chain arrangement where the output of one unit is sent to the second unit, the output of the second unit is sent to the third, and only the output of the third unit is sent to the arithmetic controller.

This plain-language reading is consistent with the specification. For example, Figure 2 of the '666 patent shows each of the three units (multiplication unit 15, addition unit 16, and sign inversion unit 17) sending its respective output to the controller 14:



A46 (annotated).[4]

The Board was therefore correct in deciding that the wherein clause means that "the output values of the multiplication unit, the addition unit, and the sign inversion unit are feedback to the arithmetic controller, although those values may pass, unchanged, through intermediate components (e.g., latches and multiplexers)."

### B.    The Board's construction of the wherein clause was fair to IBM.

In addition to contesting the substance of the Board's claim-construction decision, IBM argues that the Board's procedure for construing the wherein clause was error: "The PTAB also erred by changing its construction based upon argument raised after all briefing was closed." Blue Br. 26. The process for construing the claims was not error and was fair to IBM.

---

[4] The parties agree that the three outputs from these three units do not go directly to the controller. In addition to traveling through the temp_data bus, they pass through a multiplexer that is not shown in the figure. In plain terms, a multiplexer does not alter the signals entering it, but simply directs traffic, making the multiple signals take turns using a single output. A9. The multiplexer here therefore acts as a traffic cop, directing traffic to prevent the three units' outputs from colliding on the temp_data bus. Blue Br. 37. But like the temp_data bus itself, the multiplexer does not alter the values of the three outputs. It simply allows each of the three output values to travel to the controller without colliding.

### 1. The Board's construction held IBM to the same standard IBM set for itself in its petition.

The Board's claim construction cannot be prejudicial to IBM because the Board's construction was broader than the construction initially proposed by IBM in its petition. IBM argued in its petition that the wherein clause required "direct" transmission of the three units' outputs to the controller. A174-75. According to IBM, the outputs of the three units had to pass from the units to the controller without passing through intermediate circuit components. Because the outputs passed directly to the controller, those outputs must have been unchanged.

The Board found that IBM's current claim-construction argument (that the outputs can be changed and still be considered feedback) would be inconsistent with IBM's original position in its petition: "Petitioner did not argue that feedback could include data that changed in value from an arithmetic unit to a controller. Such an argument would have been inconsistent with Petitioner's proposed construction that feedback must be direct." A37.

Ultimately, the Board's construction was broader than the construction IBM asked for (and applied) in its petition. The Board's construction broadens IBM's construction by allowing the output to be fed back both "directly" (as IBM proposed) and also "indirectly" (which IBM's proposal would have excluded). At the same time, the Board's construction kept intact the requirement that the value output by a unit must reach the controller.

30

### 2. IBM was on notice of the present claim-construction issue before it filed its reply.

IBM is wrong when it asserts that the present claim-construction issue arose for the first time at oral argument. The Board based its construction of the wherein clause "upon the evidence presented in the Petition and the PO Response." A35. And the colloquy during oral argument that IBM complains about was simply "Patent Owner respond[ing] to [the Board's] questions seeking to focus the dispute between the parties as reflected in the Petition and PO Response." *Id*.

This was not a new, out-of-the-blue construction. Even if it was, the Board is not required to pick between the two parties' proposed constructions, as IBM argues. Instead, the Board's construction was the commonplace result of the issues in this case being focused as the case proceeded. Such focusing of issues is the natural, and preferable, result of a case that is litigated by competent attorneys before a capable Judge or Board.

Intellectual Ventures argued in its response that Dworkin does not teach "feedback" from its units because, except for the leftmost one, its sub-ALUs outputs are not sent to the controller but are instead sent into adjacent sub-ALUs, which in turn perform logical operations on those outputs. A293-300. That is, Dworkin does not teach feedback from the units because the units' outputs are modified by the adjacent sub-ALUs. IBM is wrong that the claim construction issue here came out of thin air—it was consistent with Intellectual Ventures'

arguments regarding the scope of the invention and its relationship to the prior art and a natural outcome in view of the evidence presented to the Board.

Underscoring that this claim-construction argument was not a new one, as IBM now asserts, IBM could have objected at the hearing but did not. IBM objected to patent owner's "detailed Dworkin argument," not to claim construction. A36.

### C. IBM waived its claim-construction argument because IBM delayed presenting it until the Request for Rehearing.

Once IBM received Intellectual Ventures' response, arguing that Dworkin does not teach feedback because the output of each sub-ALU (except the leftmost) is modified by the sub-ALU to its left, IBM had two feasible responses. First, IBM could have contested Intellectual Ventures' description of Dworkin's operation or, second, IBM could have argued that the claims were broad enough to encompass Intellectual Ventures' description of Dworkin's operation. IBM pursued the former, but not the latter, course.

It was not until its request for rehearing that IBM argued that Intellectual Ventures' correct description of Dworkin's operation falls within the scope of the claims—that the claims are broad enough to cover only a single output with the rest being subsequently modified before reaching the controller. Because IBM failed to timely raise this claim construction argument below, it should not be heard on that argument in this appeal. Absent exceptional circumstances, this Court

does not consider arguments that were not timely presented to the Board. *In re Baxter Int'l*, 678 F.3d 1357, 1362 (Fed. Cir. 2012). There are no such exceptional circumstances here.

### 1. In its petition, IBM argued that the wherein clause requires sending each of the three outputs directly (and therefore unchanged) to the controller.

IBM argued in its petition that feedback should be narrowly construed to require sending directly to the controller. Because directly transmitting a value does not change it, the construction IBM proposed in its petition and the arguments it made regarding the art contradict its position on appeal. A37.

Had IBM proposed its current claim construction in its petition, it would not have needed to look beyond its primary reference, Matsuzaki, which discloses a multiplier and an inverter sending their outputs to an adder, which in turn sends its output to the controller. This is similar to Dworkin in that each of Dworkin's sub-ALU's sends its output to the sub-ALU on its left, and the leftmost sub-ALU sends its output to the controller.

But as the Board recognized, IBM conceded that Matsuzaki does not teach feeding back the outputs from its multiplier and its sign inverter to the controller:

> As can be seen in [Matsuzaki's] Figure 17 . . . the outputs of the multiplier and sign inversion unit are fed to the adder, rather than the controller. The adder operates on (and, thus, changes) those values and outputs a single feedback to the controller. Thus, we find that Matsuzaki does not disclose the feedback limitation of claims 1 and 4.

33

A15-16; *see also* A183; A504 (at ¶ 116).

> ### 2. In response, Intellectual Ventures pointed to Dworkin's Figure 6 to demonstrate that Dworkin did not teach feedback from multiple sub-ALUs.

In its Patent Owner Response, Intellectual Ventures demonstrated that IBM's petition is wrong: only Dworkin's leftmost sub-ALU sends its output to the controller and each of the remaining sub-ALUs sends its output to the sub-ALU to its immediate left. A17-21; A297-300.

Thus, as Intellectual Ventures showed, Dworkin "does not disclose feedback of outputs (plural) of computational units to an arithmetic controller." A300. The Board agreed, finding Intellectual Ventures' explanation and evidence "very persuasive." A18-20.

Contrary to IBM's assertion in the Blue Brief, the Board did not adopt "the parties' explanation of Dworkin's 'shift left' operation." Blue Br. 34. The Board adopted Intellectual Ventures' explanation, which did not address any "shift left." A19-20; A38 ("[W]e weighed the evidence and made a factual finding that Patent Owner's expert testimony was credible, accurately describing Dworkin, and that Petitioner's expert testimony lacked credibility, inaccurately describing Dworkin."). As explained in the following sections, the only shift-left explanation in this proceeding is the incorrect theory IBM presented in its reply brief.

### 3.    IBM did not argue in reply that the wherein clause should be construed to encompass Intellectual Ventures' explanation of Dworkin.

Intellectual Ventures' response put the correct explanation of Dworkin's disclosure, including Figure 6, squarely in front of IBM. But IBM did not argue in its reply that the wherein clause reads on this Dworkin Figure 6 explanation.

Instead, IBM argued that Intellectual Ventures' explanation was wrong, pointing to Dworkin's pseudocode and arguing that the C register repeatedly shifts left to transfer each sub-ALU's output bit to the controller *without changing* the output bits' values:

> In the Reply, Petitioner changed its theory on how Dworkin operates. First, Petitioner admitted that Dworkin in fact did not teach feeding back the outputs of a multiplication unit, a sign inversion unit, and an addition unit to a controller. Reply 7. Petitioner then introduced a second theory of Dworkin's operation, supported by a new declaration from its expert. In particular, the Reply contended that Patent Owner's description of Dworkin was incorrect and that the outputs of each of the sub-ALUs themselves (not values changed by intermediate calculations) were left-shifted to the controller. Reply 8-9.

A37-38 (citing A345, 346-47).

### 4.    On appeal, IBM muddies the record by using shift-left terminology to refer Intellectual Ventures' Figure 6 explanation of Dworkin.

Until IBM's Blue Brief, no one used shift-left terminology to describe the interconnections between Dworkin's sub-ALUs as shown in Figure 6. The Board, Intellectual Ventures, and IBM all used shift-left terminology solely to refer to IBM's reply theory, *i.e.*, that Dworkin's C register is a shift register and Dworkin's

pseudocode shows that the C register shifts left to transfer each sub-ALU's output bit to the controller. A19-20 (Board rejecting IBM's reply theory); A37-38 (Board recounting IBM's various Dworkin theories); A344-48; A377-78, A394-96, A419.

IBM's Blue Brief, however, confuses the issues before this Court by referring to Intellectual Ventures' explanation using Figure 6 (that was adopted by the Board and IBM at rehearing and on appeal) as "shift left." *E.g*., Blue Br. 34, 35, 37. IBM attempts to capitalize on its misleading terminology by making statements such as "Dworkin's 'shift left' operation satisfies the proper broadest reasonable interpretation of 'feedback' is not surprising, given that it is equivalent to the '666 patent's multiplexing." Blue Br. 37.

IBM's statement is misleading and false. It is misleading because the Board rejected IBM's shift-left reply argument and adopted Intellectual Ventures' Figure 6 explanation. A18-20. But because "IBM does not dispute the PTAB's factual findings regarding how Dworkin operates as set forth in the Final Written Decision" (Blue Br. 34), IBM must be referring to the Figure 6 explanation that appears essentially intact in IBM's Blue Brief at 36 without any shift registers shifting left. *Compare* A18-19 *with* Blue Br. 36.

It is false because, if providing an output as an input to another sub-ALU was truly equivalent to multiplexing, the output value would be unchanged, just as it would be if sent through a multiplexer. IBM would not need a new claim

construction: the Board held that the wherein clause encompasses sending the multiple outputs through intermediate components, including "multiplexers." A9. But providing one of five inputs to a sub-ALU that will apply logical operations to all five inputs to arrive at a result is not simply transferring that one input through that sub-ALU as IBM stated.

## II.     This Court should affirm because substantial evidence supports the Board's factual finding that IBM failed to show a reason to combine Matsuzaki and Dworkin.

Should this Court affirm the Board's claim construction or find that IBM waived its new claim construction arguments, it may affirm the Board's decision without further analysis because IBM does not argue that the art teaches the wherein clause under the Board's construction.

This Court should also affirm the Board's decision for the independent reason that substantial evidence supports the Board's factual finding that IBM failed to show "a reason, with rational underpinning, to combine Matsuzaki and Dworkin." A29. IBM's failure was largely due its shifting technical theories. In its petition, IBM argued that Dworkin disclosed direct feedback of the outputs from multiplication, sign-inversion, and addition units to a controller. A39.

In reply, IBM "admitted that this explanation of Dworkin was incorrect and advanced a new theory of Dworkin's operation." *Id*. As a result, the Board "found that the Petition, because it was based on the first theory, lacked explanation of

37

how or why skilled artisan would have modified Matsuzaki under Petitioner's second theory of Dworkin's teachings." *Id.*

The Board found IBM's evidence for a motivation to combine (even under its first theory) was insufficient; the Board concluded that "merely pointing out similarities between Matsuzaki and Dworkin and invoking the words 'common sense' is not a sufficient articulation of a reason to combine." A26 (citing A519 at ¶ 149); A29 ("Evidence that Matsuzaki and Dworkin have similarities and argument that the combination is mere 'common sense' are not enough.").

IBM seeks to reverse the Board's fact findings on this issue, arguing that the Board applied the wrong legal standard and that the Board's factual findings were not supported by substantial evidence. Intellectual Ventures addresses IBM's arguments in turn.

### A.    The Board applied the correct legal standard in finding IBM failed to articulate how or why one of skill would have combined the references.

IBM argues that the Board applied the wrong legal standard in its factual finding that IBM failed to show there would have been a reason to combine the teachings of Matsuzaki with the teaching of Dworkin. The thrust of IBM's argument is two-fold: First, the Board incorrectly placed the burden on IBM to show how or why Matsuzaki's teaching would have been modified by the teachings of Dworkin with explicit reasoning. Second, the Board incorrectly

required IBM show how a skilled artisan would have "physically combined" Matsuzaki and Dworkin.

IBM is wrong on both counts.

> **1.    The Board correctly decided that IBM had the burden to show how and why one of skill would have combined the teachings of Matsuzaki and Dworkin.**

The law is well settled: IBM bore the burden to show obviousness, including a demonstration that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so. 35 U.S.C. § 316(e); 37 C.F.R. §§ 42.2, 42.104; *InTouch Techs. v. VGO Commc'ns*, 751 F.3d 1327, 1351 (Fed. Cir. 2014) ("A party seeking to invalidate a patent on obviousness grounds must 'demonstrate' . . . that skilled artisan would have been motivated to combine the teaching of the prior art references . . . .").

Although the *KSR* test is flexible, the Board "must still be careful not to allow hindsight reconstruction of references . . . without any explanation as to *how* or *why* the references would be combined to produce the claimed invention." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc*., 688 F.3d 1342, 1368 (Fed. Cir. 2012) (emphasis added); *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007).

IBM is incorrect that *KSR*'s requirement for explicit reasoning is an "instruction to lower courts," that does not apply to IBM in this IPR proceeding.

Blue Br. at 47-48. This argument proves too much; there must be detailed evidence in the first instance for a court, or the Board, to later provide an explicit analysis. To be sure, this Court applied *KSR*'s requirement of "articulated reasoning with some rational underpinning" in assessing the sufficiency of a party's obviousness evidence and reversing a judgment of invalidity: "Dr. Yanco's testimony was vague and did not articulate reasons why a person of ordinary skill in the art at the time of the invention would combine these references." *InTouch Techs. v. VGO Commc'ns*, 751 F.3d 1327, 1351 (Fed. Cir. 2014).

The Board therefore properly required IBM to present evidence showing how or why one of ordinary skill would have combined the teachings of these two references.

### 2.    The Board did not require IBM to physically combine the references.

IBM argues that the Board impermissibly required IBM to explain how to physically combine the references. Blue Br. 39-41. In IBM's words, "the PTAB wrongfully expected IBM to show ***how*** a POSITA could ***physically*** replace the multiplication, addition, and sign inversion units, along with their outputs, taught

in Matsuzaki with the computational units and their outputs taught in Dworkin." [5]

Blue Br. 40 (emphasis in original).

IBM is correct that the obviousness analysis does not require physically combining the references, but it misstates the Board's findings. The Board did *not* find that Matsuzaki and Dworkin could not be physically combined, and it did *not* require to IBM to make such a showing:

> Petitioner is correct that the law does not require a showing that Matsuzaki and Dworkin could be bodily incorporated into one another. We imposed no such requirement.

A39 (internal citation omitted).

Instead, the Board focused on the art's *teachings*, analyzed all of IBM's arguments and evidence, and found that IBM's assertion that superficial similarities and its expert's bare recitation of "common sense" were not a sufficiently articulated reason with a rational underpinning to support a conclusion of obviousness on these facts. A21-29. IBM did not provide anything more than "[e]vidence that Matsuzaki and Dworkin have similarities and argument that the combination is mere 'common sense.'" A29.

---

[5] IBM points to the Final Written Decision (Blue Br. 40 (citing A16-17)), which is a portion of the Board's final written decision addressing IBM's failure to show that Dworkin teaches feedback and addresses IBM multiple and conflicting theories of how Dworkin operations. The Board's motivation to combine section is at A21-30.

**B.    The Board did not legally err in finding that Dr. Koç's invocation of "common sense" was insufficient.**

The Board, as fact finder, found that IBM's evidence for the motivation-to-combine element was unpersuasive and insufficient. But IBM recasts the Board's decision, arguing that the Board "dismissed as a matter of law Dr. Koç's testimony" regarding common sense and "[holding] that common sense only applies in the absence of expert testimony." Blue Br. 46 (citing A25-26 and A518-19); *see also* Blue Br. 47 ("The PTAB's complete dismissal of this aspect of IBM's expert's testimony was legal error.").

IBM misstates the record and is wrong on the law. The Board did not, as a matter of law, dismiss IBM's common-sense rationale; rather the Board weighed the evidence, found the technology was complex, and ruled that common sense was therefore not enough. The Board recognized that common sense may be used in the obviousness analysis, accurately quoting this Court's precedent: "To be sure, 'the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony.'" A26 (quoting *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239 (Fed. Cir. 2010)).

But when the technology is complicated, common sense may not be sufficient. *Kinetic Concepts*, 688 F.3d at 1369. Here, the Board found as a matter of fact that "the technology at issue here is not 'easily understandable'; rather, it is sufficiently complex such that expert testimony is particularly helpful to our

resolution of the factual dispute regarding the purported reasons to combine the references." A26. IBM does not challenge this finding of fact, and it does not explain on appeal exactly how common sense would have led one of skill to combine Matsuzaki's teachings with those of Dworkin, a complicated reference that IBM and its expert were unable to explain correctly in two separate attempts.

Finally, IBM cites two non-precedential cases that are unlike this case. In each case, the technology and common-sense reasoning was simple and explained by the challenger's expert. Blue Br. 46 (citing *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 987-91 (Fed. Cir. 2014) and *Duramed Pharm., Inc. v. Watson Labs., Inc.*, 413 F. App'x 289, 294 (Fed. Cir. 2011)).

The *I/P Engine* court noted that "very basic logic dictates" that the user's search query is "highly pertinent" to an evaluation of the relevance of the search results, and that expert testimony explained that the user's query would be readily available. *I/P Engine*, 576 F. App'x at 989. And in *Duramed*, this Court found that a defendant's expert testimony regarding a reason to combine (to mitigate estrogen withdrawal headaches with unopposed estrogen) in addition to the teachings of the references (headaches are a symptom of estrogen withdrawal and unopposed estrogen alleviates them) were sufficient to defeat a motion for summary judgment of nonobviousness. *Duramed*, 413 F. App'x at 294-97.

**C.    Substantial evidence supports the Board's finding that IBM did not articulate sufficient reasoning with a rational underpinning to support the legal conclusion of obviousness.**

In a similar vein, the Board weighed IBM's evidence that the similarities between Matsuzaki and Dworkin—both are hardware implementations of a cryptographic co-processor—and found that this evidence was not persuasive or sufficient to show a reason to combine the references: "we are not *persuaded* that [Koç's] testimony explains why the references would have been combined." A25 (emphasis added).

IBM did not explain and proffer evidence showing how or why one of skill would combine the teachings of these two disparate hardware implementations: how or why one of skill would have modified the data flow between Matsuzaki's word-sized multiplier, inverter, and adder in view of the data flow between Dworkin's single-bit generic sub-ALUs. Both circuits function as is, and the Board found that IBM "offer[ed] no evidence that Dworkin's feedback is advantageous or that adding this feedback to Matsuzaki would have improved Matsuzaki." A28.

IBM complains that its expert, "Dr. Koç was entitled to determine that a POSITA would have been motivated to combine Matsuzaki and Dworkin applying, *inter alia*, his common sense." Blue Br. 47.[6] That may be true, but the Board is not

---

[6] IBM asserts that it provided "multiple reasons" (Blue Br. 42) and "specific reasons" (Blue Br. 46) that one of skill would have combined, but it does not

bound by Dr. Koç's testimony, which the Board found was not supported by sufficient reasoning. "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *InTouch Techs. v. VGO Commc'ns*, 751 F.3d 1327, 1347, 1352 (Fed. Cir. 2014) (reversing a judgment of invalidity).

IBM also argues that because Dr. Koç used the words "would have combined" instead of "could have combined," his conclusory testimony should carry the day. Blue Br. 45-46 ("[H]e testified that a POSITA ***would*** have combined these references because of their ***numerous*** similarities." (emphasis in original)).

But that argument misses the point: substantial evidence supports the Board's finding that these similarities, along with his unexplained recitation of common sense, was not a sufficiently articulated rationale for combining the teachings of these two references. IBM proffered very little argument and even less evidence in its petition, but the Board carefully analyzed all of it, concluding that it amounted to allegations of similarity and a bare recitation of "common sense." A23 (block-quoting A197, and concluding that the only reasons to combine proffered in the petition are the purported similarities); A24-25 (walking through

---

identity any reasons except the similarities and invocation of "common sense" that the Board addressed at length in its final written decision and denial of rehearing. A23-26, 29; A39-42.

each paragraph of Dr. Koç's testimony at A517-19 at ¶¶ 145-49).[7] The Board correctly found that, in *this* case with *these* references, IBM's similarities and bare invocation of common sense are not a sufficiently articulated rationale to combine the fundamentally different teachings.

Whether the evidence shows a sufficient rationale turns on the facts of each case. In *Kinetic Concepts*, for example, the references taught different methods for treating wounds by draining fluids. *Kinetic Concepts*, 688 F.3d at 1369. But there was no evidence in the record why those skilled in the art would have combined the teachings of the two references. *Id*. The court concluded that the challenger had not demonstrated that the combination was obvious. *Id*. "Because each device independently operates effectively, a person having ordinary skill in the art, who was merely seeking to create a better device to drain fluids from a wound, would have no reason to combine the features of both devices into a single device." *Id*.

Likewise, the Board here correctly found that the alleged similarities and bare recitation of common sense in IBM's petition were not enough. As in *Kinetic*, Matsuzaki and Dworkin operate independently, and further, they are fundamentally different. A28; A966-67 (Dr. Schaumont opining that these two "alternative designs" are "based on very different design philosophies"); A329. So there would

---

[7] When analyzing the Koç Declaration, the Board noted that it was exercising its discretion to go beyond the arguments actually presented in the Petition. A24 at fn. 1.

have been no reason to combine these disparate teachings. A966-67 (Dr. Schaumont opining that: "One of ordinary skill in the art might consider implementing one or the other design, but would not combine both into a single design.").

To be sure, the failure of IBM's evidence is due in part to its introduction of a new theory in the reply for Dworkin's operation without also providing a new motivation to combine in light of its new technical theory. The Board explained on rehearing that it had "found that the Petition, because it was based on the first theory, lacked explanation of how or why skilled artisan would have modified Matsuzaki under Petitioner's second theory of Dworkin's teachings." A39-40. And in this appeal, IBM points only to the evidence in its petition. Blue Br. 42-49 (citing its petition and the declaration filed with its petition). That evidence cannot and does not address IBM's new theory of Dworkin, which like Matsuzaki, entails only one unit sending its feedback to the controller, while the other units send their outputs to that one unit.

## CONCLUSION

For the reasons above, the Court should affirm the PTO's final written decision that IBM did not show claims 1-11 to be unpatentable.

Dated: October 14, 2015.

Respectfully submitted,

 /s/ Jonathan M. Strang
Jonathan M. Strang
Byron L. Pickard
Lori A. Gordon
**Sterne Kessler Goldstein & Fox PLLC**
1100 New York Ave., N.W.
Washington, DC 20005
202.371.2600

Peter J. McAndrews
McANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL 60661
(312) 775-8000

*Counsel for Appellee,*
*Intellectual Ventures II LLC*

## CERTIFICATE OF SERVICE

I, Jonathan M. Strang, hereby certify that a copy of **BRIEF OF APPELLEE, INTELLECTUAL VENTURES** was served by electronic mail via the CM/ECF system, addressed to:

Kenneth R. Adamo
Brent P. Ray
Eugene Goryunov
Meredith Zinanni
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Tel: (312) 862-2000
Kradamo@kirkland.com
Brent.ray@kirkland.com
Egoryunov@kirkland.con
Meredith.Zinanni@kirkland.com

John C. O'Quinn
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W
Washington, D.C. 20005
Tel: (202) 879-5000
johnoquinn@kirkland.com

*Attorneys for Appellant*

Dated: October 14, 2015

Respectfully submitted,

 /s/ Jonathan M. Strang
Jonathan M. Strang
**Sterne Kessler Goldstein & Fox PLLC**
1100 New York Ave., N.W.
Washington, DC 20005
202.371.2600

*Counsel for Appellee,*
*Intellectual Ventures II LLC*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 11,060 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2010 in 14 point Times New Roman.


/s/ Jonathan M. Strang
Jonathan M. Strang
**Sterne Kessler Goldstein & Fox PLLC**
1100 New York Ave., N.W.
Washington, DC 20005
202.371.2600

*Counsel for Appellee,*
*Intellectual Ventures II LLC*